T.C. Memo. 2013-27

UNITED STATES TAX COURT

ESTATE OF SHIRLEY C. GIOVACCHINI, DECEASED, DONOR, LISA
LEKUMBERRY, EXECUTOR AND TRUSTEE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20122-05.                                  Filed January 24, 2013.

R determined a deficiency in E's Federal estate tax. In a
separate notice of deficiency, R determined a Federal gift tax
deficiency for D's 2000 tax year. Both deficiencies inter alia were
determined on the basis of a determined understatement of the value of
High Meadows, parcels of real property covering approximately 2,500
acres near Lake Tahoe, California. R also determined accuracy-related
penalties pursuant to I.R.C. sec. 6662 with respect to both deficiencies.
After concessions, the issues before the Court are the values for estate
and gift tax purposes of D's interest in High Meadows and the
applicability of the I.R.C. sec. 6662 penalty.

Held: The values of the High Meadows parcels of real property
were higher, on the applicable gift tax and estate tax valuation dates,
than those reported on the respective filed gift and estate tax returns.
The values were at the same time lower than those determined in the
notices of deficiency.

**[\*2]**        Held, further, the undervaluations were due to reasonable cause within the meaning of I.R.C. sec. 6664(c) and, therefore, the I.R.C. sec. 6662 penalties do not apply.

Daniel M. White, Steven G. Amundson, James L. Kelly, and Linda J. Sinclair, for petitioner.

David W. Sorensen, S. Mark Barnes, and Derek W. Kaczmarek, for respondent.

## CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.    Brief Family History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.    The Trimmer High Meadows Ranch and the Williamson Act . . . . . . . . . . . 6

C.    High Meadows:  Background of Events Leading Up to an
      October 4, 2001, Purchase Agreement . . . . . . . . . . . . . . . . . . . . . . . . 9

      1.    Early Appraisals and Prospective Buyer's Interest . . . . . . . . . . . . . . 9

      2.    Creation of Family Trust and Sale of 50% of
            High Meadows to High Meadows Six, LLC . . . . . . . . . . . . . . . . . 10

D.    October 4, 2001, Purchase Agreement . . . . . . . . . . . . . . . . . . . . . . . . 12

E.    Events Leading Up to Closing on the Sale of High Meadows . . . . . . . . . . 15

F.    Continuing Efforts To Expedite the High Meadows Sale . . . . . . . . . . . . . 17

G.    Amendments to the High Meadows Sales Contract . . . . . . . . . . . . . . . . . 23

[*3] H.      Closing on the Sale of High Meadows . . . . . . . . . . . . . . . . . . . . . . . 25

I.      2000 Gift Tax Return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

J.      2001 Estate Tax Return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

K.      Notices of Deficiency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

L.      Application of the Definition of Fair Market Value . . . . . . . . . . . . . . . . . . 28

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I.      Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

II.      Gift Tax:  General Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III.      Estate Tax:  General Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV.      Value Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      A.      Mr. Harrison's December 11, 2002, Appraisal Report . . . . . . . . . . 33

      B.      Expert Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

            1.      Respondent's Expert Lee B. Smith . . . . . . . . . . . . . . . . . . . 37

            2.      The Estate's Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

                  a.      Dr. Thomas F. Cargill . . . . . . . . . . . . . . . . . . . . . . . . . 40

                  b.      Gary D. Midkiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

                  c.      Steven J. Herzog . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

                  d.      Steven R. Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

                  e.      William G. Kimmel . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**[\*4]**             f.      Thomas W. Clark, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . 49

V.      Values of High Meadows for Estate and Gift Tax Purposes . . . . . . . . . . . . 49

     A.      The January 31, 2003, Sale of High Meadows as Some Evidence
        of High Meadows' Value for Estate and Gift Tax Purposes . . . . . . . 51

        1.      Evidence of the Sale Is Admissible. . . . . . . . . . . . . . . . . . . . 51

        2.      The January 2003 Sale Is the Best Evidence of Value . . . . . . 58

     B.      Other Significant Factors Affecting High Meadows Valuation . . . . 63

        1.      Highest and Best Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        2.      Access Issues and Changing USFS Policies . . . . . . . . . . . . . 65

            a.      McFarland's Case:  Snow Shoes, Dog Sled, and
                Cross Country Skis. . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

            b.      Mackie's Case:  Hiking, Canoe With Portage and
                Horseback . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

            c.      Fitzgerald's Case:  Revokable Permit and
                 a Kick Me Annual Fee . . . . . . . . . . . . . . . . . . . . . . . . . 73

            d.      Lessons Learned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

        3.      Principal Issues Negatively Affecting High
            Meadows' Value as of Both Relevant Valuation Dates . . . . . 78

     C.      Need for Valuation Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . 86

     D.      Court's High Meadows Sale Price Adjustments . . . . . . . . . . . . . . . 88

        1.      Rising Prices Valuation Correction Date Adjustments . . . . . . 88

**[\*5]**    2.    Adjustment for Uncertainty of Access . . . . . . . . . . . . . . . . . . 92

3.    Parcel Size Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

4.    Application of the Adjustments . . . . . . . . . . . . . . . . . . . . . . 103

E.    Valuation Determinations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

VI.    Section 6662 Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  This case is before the Court on a petition for redetermination of two separate deficiencies.  Respondent determined that the estate is liable for (1) a $9,818,040 estate tax deficiency and a $2,817,294 section 6662 penalty and (2) a $3,784,333 gift tax deficiency and a $722,573 section 6662 penalty for the 2000 tax year.[1]

The parties have resolved a number of issues and have filed two stipulations of settled issues.  The remaining issues for decision are (1) the values for gift and estate tax purposes on June 27, 2000, and October 8, 2001, respectively, of an interest in real property located near and southeast of Lake Tahoe, California,

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended for the applicable excise tax dates of gift and death, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*6] which the parties refer to as High Meadows, and (2) whether the estate is liable for the section 6662 penalties.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations of settled issues, the stipulated facts, and the accompanying exhibits, although not necessarily their contents and conclusions, are hereby incorporated by reference into our findings.

Mrs. Shirley C. Giovacchini (Shirley) was diagnosed with multiple myeloma in 1999 and passed away on October 8, 2001. Her daughter, Ms. Lisa Lekumberry, was appointed executor of the estate. Ms. Lekumberry resided in Nevada when she filed the petition in this case.

A.     Brief Family History

Shirley and her husband Mr. Roy Giovacchini (Roy) were members of pioneer Nevada families who settled near Genoa, Nevada, in the mid-19th century. Shirley was born to Mr. and Mrs. Arnold and Annie Trimmer (Trimmers) in 1939. She married Roy in 1959. Roy and Shirley had three daughters. Roy died on May 28, 1997.

B.     The Trimmer High Meadows Ranch and the Williamson Act

In 1929 Shirley's father and grandfather purchased High Meadows. High Meadows consists of contiguous parcels of real property, ranging from an

**[\*7]** elevation of 6,600 feet to over 9,200 feet, well over one mile and rising to nearly two miles, above sea level. High Meadows is about two miles south of the Heavenly Valley Ski Resort on the southwest shoulder of the ski resort's 10,067-foot high Monument Peak summit. Portions of High Meadows are quite mountainous and difficult to accurately survey or measure. It covers approximately 2,350 to 2,500 acres near Lake Tahoe, California.[2] On or about March 15, 1968, a deed was executed conveying High Meadows from the Trimmers to Roy and Shirley Giovacchini.[3] Roy and Shirley's children spent every summer riding horseback at High Meadows. The family took its cattle there during the summer and cut firewood and Christmas trees in the fall.

On January 26, 1971, the Trimmers entered into a contract with the County of El Dorado in which they agreed to limit the use and development of High Meadows in accordance with the California Land Conservation Act of 1965 (Williamson Act). Cal. Gov't Code secs. 51200-51297.4 (West 1983 & Supp. 2000). Landowners benefit from Williamson Act contracts by receiving favorable

---

[2]Because of the very steep mountainous terrain which is included in a part of the property, the parties do not, to this day, know the exact acreage of High Meadows. In the end they have assumed it to be 2,356 acres.

[3]Annie Trimmer died in 1978, and Arnold Trimmer died on March 18, 1985. The deed conveying High Meadows from the Trimmers to the Giovacchinis was not recorded until April 23, 1985, after Arnold Trimmer's death.

[*8] property tax treatment in exchange for limiting the use of their lands.  See

Estate of Luton v. Commissioner, T.C. Memo. 1994-539.

Under the heading "LAND USE", the Williamson Act contract stated that the use of High Meadows was to be limited "to agricultural and compatible uses" and that "Structures may be erected on the property (and existing structures enlarged) if they are directly related to and compatible with permitted uses."   The initial term of the contract was 10 years, but the contract provided for an automatic 1-year extension at the end of each subsequent year unless either party served written notice of nonrenewal in accordance with the terms of the contract.  Stated in simpler terms, the contract was designed so that the development restrictions would lapse 10 years after notice of nonrenewal.  Otherwise, it was to remain in effect.[4]

---

[4]Absent notice of nonrenewal and a 10-year wait, the landowner may seek cancellation of a Williamson Act contract. Cancellation of a Williamson Act contract requires governmental approval (e.g., the county board of supervisors or city council) and generally requires that the landowner pay a 12.5% cancellation fee, which is based on the property's market value at the time of cancellation. See Cal. Gov't Code sec. 51283 (West 1983 & Supp. 2000); see also Evatt v. Commissioner, T.C. Memo. 1992-368 ("A Williamson Act contract   * * * requires State approval for cancellation of the contracts.").

[*9] C.       High Meadows:  Background of Events Leading Up to an
              October 4, 2001, Purchase Agreement

In a letter dated October 24, 1986, Sonia Jacques, a field representative for

The Trust for Public Land (TPL), informed Gilbert G. Wright, a land appraiser, that

TPL wanted a preliminary appraisal of High Meadows because it was interested in

acquiring the property.  A subsequent letter from Ms. Jacques to Roy and Shirley

(dated July 16, 1988) also reflects TPL's continuing interest in acquiring High

Meadows.

1.       Early Appraisals and Prospective Buyers' Interest

In an appraisal report prepared for the U.S. Forest Service (USFS),

appraisers Stephen R. Johnson and Mr. Wright appraised the 2,356.10 acres of

High Meadows at $3,800,000 ($3,300,000 for the land and $500,000 for 6,800,000

board feet of merchantable timber) as of April 10, 1990.  Mr. Johnson updated that

appraisal on August 5, 1991, valuing High Meadows at $4,100,000.  After Roy's

death on May 28, 1997, Mr. Johnson and Lynn Barnett-Burton appraised 2,553.96

acres of High Meadows (essentially the same property, but with a different

acreage). This time the appraisal was made on behalf of Roy's estate for the

purpose of determining High Meadows' value as of the date of Roy's death.  The

appraised value was $5,375,000 ($4,500,000 for the land per Mr. Johnson and Ms.

[*10] Barnett-Burton, and $875,000 for the timber as appraised by Steve Cannon and Jim Fleming).  Roy's estate tax return listed the value of 2,553.96 acres of High Meadows as $3,837,000 for land and $743,750 for timber.

On April 1, 1998, Anna Hellman, project manager for the American Land Conservancy (ALC)[5] wrote to Ms. Lekumberry and her husband J.B. about a "ranch tour" for the U.S. Bureau of Land Management.  Dave Marlow, a USFS employee, met with Shirley and members of her family on April 29, 1998, and May 19, 1999, regarding USFS' interest in acquiring High Meadows.[6]

### 2. Creation of Family Trust and Sale of 50% of High Meadows to High Meadows Six, LLC

On July 19, 1999, Shirley transferred ownership of High Meadows to herself and Ms. Lekumberry, as cotrustees of the Giovacchini Family 1989 Trust (trust).  On June 27, 2000, the trust sold a 50% interest in High Meadows to High Meadows Six, LLC (HM6), an entity controlled by her three daughters and their

---

[5]ALC is a national sec. 501(c)(3) nonprofit tax exempt land conservation organization headquartered in San Francisco, California.  Its mission is to work with landowners and public resource agencies to create conservation solutions through land acquisition, conservation easements, restoration, and stewardship.

[6]Mr. Marlow had another meeting with Ms. Lekumberry and J.B. on February 16, 2000, and a telephone conversation with J.B. on July 6, 2000.

**[\*11]** spouses, for $2,500,000.[7] No appraisal was performed with respect to that sale. High Meadows' value and sale price were determined by the family and Mr. Randal S. Kuckenmeister, a certified public accountant (C.P.A.) who advised the Giovacchinis and their various entities on accounting and tax matters (and who prepared the estate and gift tax returns underlying this case). The value and sales price arrived at was reached using the value determined by Mr. Johnson for Roy Giovacchini's estate plus an annual increase based on the Consumer Price Index.[8]

---

[7]HM6 paid $400,000 in cash and signed a promissory note for the remaining $2,100,000.

[8]In early 2001 an attorney named Victor S. Merrill approached the Giovacchini family's advisers with an offer to enter into an option to acquire approximately 1,730 to 1,790 acres of High Meadows for the greater of $12,500 per acre or a price to be 10% higher than the price determined and approved by the U.S. Department of Agriculture. Correspondence concerning the possible option agreement, with revisions, continued through at least February 20, 2002. His goal was to get a large portion of High Meadows under option for as long as he could in order to use it in a hoped-for potential land exchange deal with the U.S. Bureau of Land Management for land in Jean Valley near and south of Las Vegas, Nevada.

Mr. Merrill never put any money down and testified that his proposed purchase price "was just a guess" and that "Almost nothing" was considered in arriving at the proposed purchase price. He also testified that it was in his best interests to pay the highest possible price for High Meadows because that would enable him to obtain more land in the subsequently intended exchange. Mr. Merrill never had the funds or funding to purchase High Meadows and ultimately abandoned the whole plan when he determined he would be unable to exchange

(continued...)

**[*12]** D.    October 4, 2001, Purchase Agreement

On May 1, 2001, the Trust, HM6, and ALC met to discuss ALC's interest in acquiring High Meadows.  On October 4, 2001--four days before Shirley's death--ALC, the Trust, and HM6 entered into a purchase agreement (and an addendum thereto) regarding High Meadows.[9]  Section 1(a) of the agreement was titled "Purchase and Sale of Subject Property".  At that time, Mr. Jacques Etchegoyhen was a Nevada State director for ALC and project manager of the High Meadows acquisition.  Mr. Etchegoyhen was also a lifelong childhood friend of Ms. Lekumberry and her husband J.B.

The purchase agreement provided that the Trust and HM6 would sell approximately 1,730 acres of High Meadows to ALC and that the Trust and HM6 acknowledged and understood that ALC intended "to secure acquisition of the Subject Property by a public agency * * * that will preserve the Sale Property in its present condition and use the Subject Property for public, open space and

[8](...continued)
California land for Nevada land.  The estate objected to some of respondent's evidence regarding this offer.  In valuing High Meadows we will disregard any evidence relating to Mr. Merrill's offer because we find the offer to be without substance and therefore immaterial to our ultimate conclusions.

[9]On September 26, 2001, the Trust and HM6 signed the purchase agreement and addendum thereto.  ALC countersigned those documents on October 4, 2001.  Shirley passed away on October 8, 2001.

[*13] recreational purposes". The Trust and HM6 also acknowledged and understood that ALC intended to "simultaneously close" its acquisition of the 1,730 acres and its conveyance of that land "to the Agency."

Section 2(a) of the purchase agreement, titled "Determination of Purchase Price" provided that the purchase price would be "the amount equal to ninety-five (95%) of the fair market value of the Subject Property as determined in the Appraisal * * * approved by Seller, Buyer and the Agency in accordance with Section 4(b)" of the agreement. Section 4(b) provided that ALC would obtain an appraisal as soon as was practicable and that "If either Seller or Buyer does not approve the Appraisal, such party shall deliver written notice thereof to the other party within ten (10) days of receipt of the Appraisal, upon which [event] this Agreement shall terminate." If no such written notice was provided, the appraisal would be deemed approved. If the agency failed to approve the appraisal within 90 days of its receipt of the appraisal report, ALC was to deliver written notice of that fact to the Trust and HM6, at which time the agreement would terminate.

ALC agreed to deposit $20,000 into escrow within two business days of the purchase agreement's effective date. ALC further agreed to deposit into escrow $250,000 within two business days of the appraisal's approval by the Trust, HM6, and ALC, and to instruct the escrow agent to release the original $20,000 earnest

[*14] money and $50,000 of the $250,000 deposit to the Trust and HM6. If the closing did not occur within one year of the purchase agreement's effective date, ALC agreed to deposit into escrow $250,000 with instructions to immediately release the funds to the Trust and HM6.

The purchase agreement also set forth a series of conditions precedent to ALC's obligation to purchase the land. Among them were the following: (1) ALC, in its sole discretion, must have approved the condition of the property; (2) the agency must have been in a position to accept title; and (3) there were no material adverse changes in the physical or environmental condition of the property between the purchase agreement's effective date and the sale's closing.

When the purchase agreement was signed, ALC did not have an agency or other public or private entity ready to purchase High Meadows.[10] It intended to contact the California-Tahoe Conservancy, the California Wildlife Conservation Board, and USFS to gauge their potential interest in acquiring High Meadows.

---

[10] ALC could not have funded the acquisition itself.

[*15] E.    Events Leading up to Closing on the Sale of High Meadows

The day after the purchase agreement was entered into, ALC hired Myron

R. Harrison to appraise High Meadows.  His signed final valuation report

indicated that

> Tahoe Regional Planning Agency Regulations require that all
> properties must have a paved access and utility service [for
> development].  * * *
>
> The subject property is accessible by traveling southwest from the City
> of South Lake Tahoe on Pioneer Trail and thence southeast on High
> Meadows Trail.  At the end of the subdivision, High Meadows Trail
> becomes High Meadows Road and consists of a road easement across
> forest service property to enter the subject property at the westerly end.
> * * *
>
> The access road to High Meadows has been in existence for many
> years at the point in time that the subject property was used exclusively
> for summer grazing of livestock.  Therefore, the continuous use of the
> right of way is an unchallenged fact.[11]

---

[11]In 1968 California and Nevada agreed to create an agency to regulate development and conserve natural resources in the Lake Tahoe Basin.  See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 394 (1979). After Congress consented to that agreement the following year, the Tahoe Regional Planning Agency (TRPA) was organized "to adopt and to enforce a regional plan for land use, transportation, conservation, recreation, and public services."

**[\*16]** Mr. Harrison sent his completed appraisal report to ALC on November 29, 2001. He valued 1,790 acres of High Meadows at $25 million as of October 10, 2001.[12]

ALC then enlisted the help of Thomas W. Clark, Jr., a licensed real estate appraiser in California who operated his own real estate appraisal and consulting firm in Sacramento, California. Mr. Clark performed a review appraisal of Mr. Harrison's October 10, 2001, valuation report. Early in his report, Mr. Clark observed that

> Appraising large tracts of undeveloped land in the Tahoe Basin, such as the High Meadows property, is extraordinarily difficult for a variety of reasons; the most significant of which are the land use issues imposed by the Tahoe Regional Planning Agency and the lack of comparable sales. * * * There simply are no sales of land that are truly comparable to the High Meadows land. Any appraisal review must, therefore, recognize that the appraiser has to exercise a significant degree of subjective analysis and judgment.

Although Mr. Clark deemed Mr. Harrison's report "reasonably well done", he concluded that "In some instances, however, the report raises more questions than are directly answered and there needs to be additional discussion of various issues." Mr. Clark concluded that "A purchaser of land with a $20,000,000 to

---

[12]Although the original purchase agreement was for approximately 1,730 acres, by the time the appraisal was prepared the parties had apparently agreed on 1,790 acres and the purchase agreement was later amended on June 20, 2002, to reflect this revised acreage.

[*17] $30,000,000 price is not making a purchase decision without some serious investigation and to the extent possible resolution of various unknowns that impact use and development." He further opined that "there are few buyers * * * that would pay $25,000,000 for a site that would only accommodate a single residential compound. The excessive exuberance of the real estate market characterized by the last few years of the 1990's is gone." Mr. Clark went on to express a number of specific concerns with Mr. Harrison's report, including questions regarding access to High Meadows.[13]

F.    Continuing Efforts To Expedite the High Meadows Sale

In a March 4, 2002, letter, ALC informed USFS that ALC "has an option agreement * * * for the purchase of approximately 1,790 acres" of High Meadows and "would like to work with [USFS] on conveyance of this land for the benefit of the people of the United States". This was the start of what was to become an ongoing dialogue between ALC and USFS regarding the acquisition of High Meadows.

---

[13]Among Mr. Clark's concerns were access, the comparable sales used by Mr. Harrison, and Mr. Harrison's use of price per square foot of coverage (i.e., permitted developable land, see discussion infra at IV.2.(f)) rather than price per acre.

**[*18]** On August 1, 2002, USFS wrote to Mr. Harrison asking him to appraise the 1,790 acres of High Meadows. In that letter USFS specified that "The appraisal must conform to the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA) * * * and the Uniform Standards of Professional Appraisal Practice [commonly known as the "yellow book"] (USPAP)" with the former to take precedence in the event of a conflict. It also defined the sought market value as

> the amount in cash, or in terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of the appraisal, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal. (UASFLA 2000).

The letter requesting the appraisal also specified:

> There is considerable discussion in the Summary of Title regarding outstanding road rights and lack of recorded access. It is intended that reciprocal access will be granted between the Giovacchini's and the USA crossing existing adjacent National Forest ownership and the property being retained by the Giovacchini's. Specific easement language * * * will be forwarded to you * * * for your consideration as to any affects to value. Therefore, for purposes of appraisal, access can be both physically and legally assumed for the subject property.

In his December 11, 2002, appraisal report, which he prepared in response to that request, Mr. Harrison valued 1,789.33 acres of High Meadows at $29,500,000 as of September 12, 2002.

**[\*19]**  In a December 16, 2002, "Appraisal Review Report", USFS Senior Review Appraiser Sharon K. Moore recommended approving Mr. Harrison's December 11, 2002, appraisal report.  Ms. Moore's report was approved the next day in a one-page document by USFS' acting regional appraiser, Kimberley V. Brower.[14]

Ms. Moore's and Ms. Brower's reviews, like the proverbial "horse led to water", did not take into consideration several factors which appraisers are directed to consider by USPAP.  This refusal to drink resulted from their interpretation of the term "conflict" as it relates to any differences between USPAP and UASFLA.  Specifically, where USPAP directs a factor be considered but UASFLA indicates consideration of that factor is not mandatory, Ms. Moore and Ms. Brower on several critical occasions chose to ignore what this Court believes amounted to decisive factors.  In response to respondent's in-court inquiries about this practice, the following colloquy with Ms. Brower addressed this issue:

---

[14]USFS was eager to acquire High Meadows and had been for some time. Leslie Morefield, a realty specialist team leader in USFS' Lake Tahoe Basin Management Unit, stated that she learned of High Meadows in 1995 when she began working for USFS and that "High Meadows has been considered the number one desired acquisition of the Forest Service" by the Lake Tahoe Basin Management Unit since she began working there.

[*20] Q: Ms. Brower, earlier you were asked a number of questions about the Yellow Book [USPAP], do you still have that in front of you?

A: Yes, I do.

Q: Could you turn to page 89. I believe petitioner's counsel pointed you to the sentence that begins "Examination of the agency's [USFS] appraisal should include". It's toward the bottom.

A: Yes.

Q: When the U.S. Forest Service looks at something like the Yellow Book, if the sentence says "should include," is that a requirement?

A: No.

Q: If you could please turn to page 90. The first paragraph without the bullet points. "A review of the agency's appraisal process should next be undertaken with particular note. Let me start over. "A review of the agency's appraisal should next be undertaken with particular note being made of any technical or factual errors reported by the reviewing appraisal." This sentence also contains the word "should". Is the U.S. Forest Service required to have an appraisal that complies with this sentence?

*　　*　　*　　*　　*　　*　　*

A: Is the word "should" in there, is it an absolute, no.

Q. Is that the case for the remainder of the paragraphs on page 90 as well as the paragraphs on page 91 that have the word "should" in them?

A. Yes.

[*21] Q.  So the U.S. Forest Service is not required to have an appraisal that meets any of these standards, when the word "should" is in there?

A.  Yes.

Ms. Moore and Ms. Brower also chose to ignore or disregard other appraisals of High Meadows, including Mr. Harrison's appraisal report of November 29, 2001, which valued High Meadows as of October 10, 2001, at $25,000,000.  Ms. Moore addressed this issue in the following colloquy with petitioner's counsel on cross-examination:

Q.  Did you ask him to provide any details about this appraisal, 56-J, that he told you about?

A.  No.

Q.  Did you ever ask him what his date of value was?

A.  No.

Q.  Did you ever ask him what his determination of value was?

A.  No.

Q.  Would it have been important for you to know, ma'am, what value he had determined some 11 months prior to the date of value on Exhibit 58-J, the Forest Service appraisal?

A.  No.

Q.  It didn't matter; is that right?

[*22] A.     Correct.

Q.     I want to be crystal clear about this.  The fact that Myron
Harrison prepared what he characterized on November 21 --
strike that, November 29, 2001, as a complete appraisal that had
a value of 25 million, that was not important to you.  Is that your
testimony?

A.     That is correct.  And can I say why?

Ms. Brower's testimony about this appraisal explained:  "We characterize it as an unsolicited appraisal."  ALC "disclosed to the Forest Service that an appraisal was done and they wanted us to look at it.  And we said no because we do not accept unsolicited appraisals, because we had nothing to do with the appraisal instructions or any of that."

They chose instead to focus only on Mr. Harrison's appraisal report of December 11, 2002, valuing High Meadows as of September 12, 2002, at $29,500,000 because this was the only report specifically sanctioned and contracted for by USFS.  ALC, although it disclosed that their earlier Harrison appraisal was done, was complicit in this approach as it also apparently suppressed the November 29, 2001, appraisal.  In a February 23, 2005, letter to Lawrence Camp, one of the respondent's large and medium size business field specialists in San Francisco, Jeff Stump, its vice president, stated:

[**\*23**] I am in receipt of your January 10, 2005 facsimile request for additional information regarding the High Meadows property. The appraisal that you requested was never reduced to final and was not shared with either the United States Forest Service or the property owner. Thus, it does not seem appropriate for American Land Conservancy to provide a copy to your office.

G. <u>Amendments to the High Meadows Sales Contract</u>.

The purchase agreement among the Trust, HM6, and ALC was amended four times. The first amendment was dated June 20, 2002. It referred to the subject property as approximately 1,790 acres of High Meadows. Therein, the parties agreed that the "Approved FMV" of the property would be no less than $26 million. If escrow did not close on or before December 31, 2002, ALC was required to deposit $300,000 into escrow not later than January 3, 2003, with instructions to immediately release the funds to the Trust and HM6. That deposit was to be nonrefundable unless the purchase agreement was terminated because of a default by the sellers. If the sale closed, the deposit was to be credited against the purchase price.

The second amendment was dated June 28, 2002. This "make weight" amendment was apparently intended as a clarification of the allocation of the selling price between the selling parties in order to facilitate the subsequent

[*24] intended claim of a charitable contribution.[15]  The third amendment, dated

August 7, 2002, provided that ALC would pay to remediate a contaminated site on

High Meadows and would receive a credit at closing for that expense.

Escrow on the sale of High Meadows did not close on or before

December 31, 2002.  And ALC did not deposit $300,000 into escrow by

January 3, 2003, as it had agreed to do in the first amendment to the purchase

agreement.  But, on January 13, 2003, the parties executed a fourth amendment to

the purchase agreement (with a retroactive effective date of January 2, 2003) in

which they then agreed that if the sale did not close on or before February 28,

2003, ALC would deposit $300,000 into escrow with instructions to immediately

release the funds to the Trust and HM6.  That deposit was to be nonrefundable

---

[15]It amended sec. 2(a) of the purchase agreement by adding the following two
sentences:

> The purchase price for the Subject Property (the "Purchase Price")
> shall be the amount equal to ninety-five percent (95%) of the fair
> market value of the Subject Property as determined in the Appraisal (as
> defined below) approved by Seller, Buyer, and the Agency in
> accordance with Section 4(b) below (the "Approved FMV"). * * *
> Seller acknowledges that the Giovacchini Family 1989 Trust is selling
> its 50% ownership in the property for 50% of the Approved FMV.
> Seller further acknowledges that High Meadows Six, LLC is selling its
> 50% ownership in the property for 45% of the Approved FMV and will
> be entitled to a charitable contribution for the remaining 5% of the
> Approved FMV.

[*25] unless the purchase agreement was terminated because of a default by the sellers. ALC also agreed to pay, subject to certain limits, the costs associated with a loan of up to $4 million that Shirley's family was to obtain by January 16, 2003, to make a required payment of the estate's estate taxes.[16]

H.    Closing on the Sale of High Meadows

On January 14, 2003, ALC and the U.S. Department of Agriculture entered into a written contract for the sale of ALC's interest in High Meadows for $29,500,000. Escrow closed on the sale of High Meadows to ALC on January 31, 2003. When the dust cleared, the estate retained its share of the $29,500,000 and an undivided 50% interest in the remaining approximately 566 acres of High Meadows (i.e., 2,356 - 1,790 = 566) that the family retained.[17]

I.    2000 Gift Tax Return

In Shirley's 2000 Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, which was prepared by Mr. Kuckenmeister, she reported having made $754,564 in gifts, $664,564 of which were taxable. That entire

---

[16]The estate had filed an estate tax return on August 19, 2002.

[17]See supra note 2.

[*26] taxable amount relates to a 43% interest in a limited partnership.[18] Shirley reported gift tax of $216,689 and, after applying $216,689 of her available unified credit, there was zero tax due.

She did not report the Trust's sale of the 50% interest in High Meadows to HM6 because Mr. Kuckenmeister believed that the sale was a fair market value transaction and, therefore, no gift was made.

J.    2001 Estate Tax Return

Shirley's estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, which was prepared by Mr. Kuckenmeister, reported the value of the estate's interest in High Meadows as $3,253,117 ($2,800,000 for the land and $453,117 for the timber).  The reported value was derived from an updated version of Mr. Johnson's December 1997 appraisal report valuing the property as of May 28, 1997, that Mr. Johnson had prepared for Mr. Kuckenmeister.[19]  When Mr. Johnson prepared his updated appraisal report

---

[18]The parties have settled the gift tax valuation and sec. 6662 penalty issues with respect to the gift of that Ranch No. 1 limited partnership interest, which was separate and distinct from the High Meadows and HM6 issues.

[19]In his updated appraisal report, Mr. Johnson valued a 100% fee simple interest in High Meadows (land and residual timber, not otherwise valued separately) at $8 million as of October 8, 2001.  He then multiplied $8 million by 50% (which came to $4 million) to account for the estate's undivided 50% interest.

(continued...)

**[*27]** valuing High Meadows as of October 8, 2001, he was aware that there were ongoing negotiations regarding a sale of High Meadows; but he had not been provided a copy of the purchase agreement.

K.    Notices of Deficiency

Respondent issued the estate two separate notices of deficiency on October 30, 2005--one for a gift tax deficiency of $3,784,333 in Shirley's 2000 gift tax and the other for an estate tax deficiency of $9,818,040.  Respondent determined section 6662 penalties (20% as to gift tax and 40% as to estate tax) with respect to both deficiencies in the amounts of $722,573 and $2,817,294, respectively.

In the Form 886A, Explanation of Items, attached to the gift tax notice of deficiency respondent asserted, among other things, that the Trust's June 27, 2000, sale to HM6 of the 50% undivided interest in High Meadows for $2,500,000 was actually in part a sale, and in part a gift in the amount of $6,958,375.  In the Form 886A attached to the estate tax notice of deficiency respondent asserted inter alia that the estate held a 50% interest in 2,356.33 acres of High Meadows (rather than

---

[19](...continued)
To that $4 million figure he then applied a 30% fractional interest discount, resulting in an appraised value of $2.8 million for the estate's interest in High Meadows as of October 8, 2001.

[*28] the 1,789.33 acres reported on the estate tax return) and that its interest in

High Meadows was worth $16,059,000 on October 8, 2001, significantly more than

the $3,253,117 reported on the estate tax return. The estate, on October 27, 2005,

filed a timely petition with this Court. A trial was held in Reno, Nevada.

L.     Application of the Definition of Fair Market Value

Initially the valuation issues presented by this case seem to be

straightforward. The definition of fair market value, specified by the USFS in its

publication UASFLA, and the definition of that term for Federal estate and gift tax

purposes, as specified by the regulations, are essentially similar. There was a

purchase of a large portion of High Meadows by USFS, an unrelated governmental

party, at "fair market value" on January 31, 2003, for $29,500,000. Consequently,

adjusting that price to account for any applicable differences in the appropriate

valuation date, specific location, and development rights should resolve the

valuation issue.

Alas, despite the words used, the USFS' practical application of its

definition of fair market value in this case is quite different from the Court's

understanding of the proper application of the term "fair market value" for estate

[*29] and gift tax purposes.[20] USFS, in this instance, determined fair market value without considering certain facts generally acknowledged by the USPAP to be highly relevant in making such a determination. This occurred either because these facts, although they should have been considered pursuant to both UASFLA and USPAP, were assumed or because, pursuant to UASFLA instructions, it was not mandatory that they be considered, or both; and the USFS employees chose not to consider them here. Thus, all facts that would affect purchase price in a hypothetical sale and which should and would have been considered by a willing seller and a willing buyer aware of all relevant facts were not in fact considered.

OPINION

I.    Burden of Proof

The Commissioner's determination of a taxpayer's liability for a tax deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the determination is improper. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, at trial the estate filed a motion to shift the

---

[20]Compare the definitions of fair market value set forth in Uniform Appraisal Standards for Federal Land Acquisitions sec. A-9 (2000) referencing "a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer", and sec. 20.2031-1(b), Estate Tax Regs., referencing "[a] willing buyer and a willing seller * * * both having reasonable knowledge of relevant facts."

**[*30]** burden of proof to respondent pursuant to section 7491. In his response to the estate's motion, "respondent concede[d] that the burden of proof, as set forth in I.R.C. § 7491 will shift to respondent". Therefore, we granted the motion in an order dated March 12, 2008. As a result, respondent bears the burden of proving the estate's liability for the estate and gift tax deficiencies. As to the determined penalties, respondent always had the burden of production pursuant to section 7491(c).

## II.  Gift Tax:  General Rules

Section 2501(a) imposes an excise tax on an individual's transfer of property by gift. The tax is imposed on the values of the gifts made during the year. See sec. 2502(a). The value of a gift of property is the property's value on the date of transfer. Sec. 2512(a). If property is transferred for inadequate consideration, then the excess of the value of the property transferred over the consideration received is deemed a gift. Sec. 2512(b); see Commissioner v. Wemyss, 324 U.S. 303, 306-307 (1945).

The donor is primarily responsible for paying the gift tax. Sec. 2502(c); sec. 25.2502-2, Gift Tax Regs. If the donor dies before paying the gift tax, the personal representative of the donor's estate is responsible for paying the tax out

**[*31]** of the estate, as a debt due the United States from the estate. See sec. 25.2502-2, Gift Tax Regs.

III.    Estate Tax:  General Rules

The Federal estate tax is an excise tax imposed "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  Sec. 2001(a); see United States Trust Co. v. Helvering, 307 U.S. 57, 60 (1939) ("An estate tax is not levied upon the property of which an estate is composed.  It is an excise imposed upon the transfer of or shifting in relationships to property at death.").  Section 2051 defines the taxable estate as "the value of the gross estate", minus any applicable deductions.  The gross estate includes "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2045.  Sec. 2031(a).  The gross estate's value is determined "at the moment of death", see Ahmanson Found. v. United States, 674 F.2d 761, 767 (9th Cir. 1981), or the alternate valuation date, if a timely election is made by the executor or personal representative, sec. 2032(a).

IV.    Value Generally

Value, for purposes of both the estate and gift tax, means fair market value. See sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs.; see also Estate of Hurford v. Commissioner, T.C. Memo. 2008-278 ("[P]roperty transferred

[*32] either by will or by gift must be taxed at its fair market value."). As a general concept, fair market value is well defined. It is "the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts". Frazee v. Commissioner, 98 T.C. 554, 562 (1992); sec. 20.2031-1(b), Estate Tax Regs.; see United States v. Cartwright, 411 U.S. 546, 550-551 (1973) ("The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gift taxes themselves[.]"). The willing buyer and willing seller are both hypothetical--they are not actual persons or the parties to the case. See Morrissey v. Commissioner, 243 F.3d 1145, 1148 (9th Cir. 2001) ("The willing buyer and willing seller are to be postulated, not as a particular named X or Y, but objectively and impersonally."), rev'g and remanding Kaufman v. Commissioner, T.C. Memo. 1999-119; Estate of Kahn v. Commissioner, 25 T.C. 227, 231 (2005) ("The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer.").

"Valuation is not an exact science and each case necessarily turns on its own particular facts." Estate of Spruill v. Commissioner, 88 T.C. 1197, 1228

**[\*33]** (1987); see Estate of Spicer v. Commissioner, T.C. Memo. 1974-13 ("The evidence presented in this case produces a classic example of why the valuation of property is not an exact science."). Thus, a valuation question is a question of fact. See Sammons v. Commissioner, 838 F.2d 330, 333 (9th Cir. 1988), aff'g on this point, rev'g in part on another ground T.C. Memo. 1986-318. Fair market value is a question of judgment rather than mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), aff'g T.C. Memo. 1961-347. Valuation is an approximation derived from all the evidence. Helvering v. Safe Deposit & Trust Co., 316 U.S. 56, 66-67 (1942); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

A.    Mr. Harrison's December 11, 2002, Appraisal Report

The $29,500,000 sale price of High Meadows, as reflected in the January 14, 2003, sales contract, was based solely on Mr. Harrison's December 11, 2002, appraisal report acquiesced in by the parties which valued 1,789.33 acres of High Meadows, as of September 12, 2002. In his report, Mr. Harrison rounded up the acreage to 1,790 acres and estimated that they had 3,102,125 square feet of allowable land coverage.[21]

---

[21]The portion of High Meadows to be acquired comprised three parcels, which Mr. Harrison referred to as parcels 4, 5, and 6. Parcel 6 was a 1,471-acre

(continued...)

**[*34]** In a section of his report titled "California Land Conservation Agreement", Mr. Harrison recounted his discussions with two El Dorado County employees regarding the implications of the Williamson Act contract on High Meadows.  In the next section of his report, titled "Access", Mr. Harrison observed that access to High Meadows "is through approximately one-half mile of * * * [USFS] owned property".  After a discussion with a USFS employee, Mr. Harrison was persuaded that access across Federal land would not be a problem and that USFS "would permit the paving and erosion control work necessary to improve the current access road to meet * * * [TRPA development] specifications."   Nevertheless, in apparent recognition of the access easement problem, he conditioned his written appraisal report in the "ASSUMPTIONS AND LIMITING CONDITIONS" section as follows, stating:  "The appraised value of the subject property is based upon the assumption that legal access rights are granted to the subject property by the ownership of the remainder and the <u>United States Forest Service</u>".  (Emphasis added.)

---

[21](...continued)
parcel.  Mr Harrison calculated that 238 of the 1,471 acres were "high capability acres" (i.e., potentially developable, at least in part, under applicable land use rules and regulations).

[*35] In preparing his report, Mr. Harrison consulted with an engineering company and a construction company regarding "The estimated cost of developing utilities and infrastructure to a selected building site on the subject property". He then estimated the total cost of such development at $1,711,120. Using a comparable sales approach, he selected seven sales occurring between December 3, 1996, and August 14, 2002. The parcels that were the subjects of those sales ranged in size from 9.1 acres to 311.2 acres. Mr. Harrison then made various adjustments to each of those parcels' sale price for purposes of their comparison to High Meadows.

Because it offers seclusion, overlooks Lake Tahoe, and has a large meadow that is suitable for horses but is also subject to many development restrictions, Mr. Harrison declared High Meadows "a desirable site for what is termed as a 'trophy residence'". [22] He anticipated that TRPA would approve a residential allocation and that High Meadows would qualify for and obtain a buildable Individual Parcel

---

[22]Near the end of his report, in a section titled "Final Value Conclusion", Mr. Harrison stated "that the highest and best use of the subject property would be for a large luxury residential estate."

**[*36]** Evaluation System (IPES) score, more than sufficient to allow a residential improvement.[23]

Before drafting his report, Mr. Harrison was provided a copy of Mr. Merrill's expired offer to enter into an option agreement for the purchase of 1,730 (with some consideration of increasing that to 1,789.33) acres of High Meadows. Mr. Harrison referred to that offer as "an expired offer to purchase" in a section of his opinion titled "Sales History".

B.    Expert Opinion

Both parties have proffered the reports and testimony of expert witnesses in order to establish High Meadows' values on the relevant valuation dates. Those opinions are admissible under the Federal Rules of Evidence (FRE) if they assist the Court in understanding the evidence or in determining a fact in issue. Fed. R. Evid. 702. We evaluate expert testimony in light of each expert's demonstrated qualifications and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). Where experts offer competing estimates of fair market value, we determine how to weigh those estimates by examining their underlying

---

[23]TRPA uses IPES scores "to rate the suitability of vacant residential parcels for building and other modification" and "any property must attain a minimum IPES score to qualify for construction". Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 729 (1997).

**[*37]** logic and the factors they considered in reaching their conclusions. See Casey

v. Commissioner, 38 T.C. 357, 381 (1962).

The Court is not bound by an expert's opinions and may accept or reject an

expert opinion in full or in part in the exercise of sound judgment. See Helvering v.

Nat'l Grocery Co., 304 U.S. 282, 295 (1938). We may also reach a determination

of value based on our own examination of the evidence in the record. Silverman v.

Commissioner, 538 F.2d at 933.

1.      Respondent's Expert, Lee B. Smith

Respondent's expert, Mr. Smith, has a bachelor of science degree in farm

management from California Polytechnic University. Mr. Smith has his own real

estate appraisal business in Carson City, Nevada. He is licensed as a general

appraiser in California and Nevada, has coauthored or edited various real estate

valuation publications, and has been a real estate appraiser since 1971. He has an

MAI designation from The Appraisal Institute and an ARA designation from the

American Society of Farm Managers and Rural Appraisers.

Mr. Smith prepared two retrospective appraisal reports for respondent in

September 2007. One values an undivided one-half fractional interest in High

Meadows in its entirety (approximately 2,289.33 acres) as of June 27, 2000, the

date of the alleged gift (first appraisal report). The other values, as of October 8,

[*38] 2001, the approximately 500 acres of High Meadows not subject to the purchase agreement (second appraisal report). Respondent asserts that the value of High Meadows on the date of Shirley's death, October 8, 2001, "is the [$29,500,000] sales price agreed to [by the estate and USFS] for the sale of the 1,790 acres [occurring at the end of January 2003] plus the [$6,780,000] value of the 500 retained acres as determined in [Mr. Smith's second appraisal report] Exhibit 173-R."

In his first September 13, 2007, appraisal report Mr. Smith valued High Meadows (in its entirety) at $25,185,000 as of June 27, 2000. For his second September 13, 2007, appraisal, he used a comparable sales approach. He started with 36 sales of properties allegedly comparable to the 500 acres (actually 566 acres) not subject to the USFS sale and narrowed his focus to 6 sales (including the sale of High Meadows to ALC) ranging in dates of sales from November 6, 1996, to October 24, 2003.

At an assumed 1,789.33 acres, the sale of High Meadows was by far the largest comparable sale. The remaining 5 comparable sale properties ranged in size from 79.81 acres to 311.20 acres and in price per acre from $17,054 to

[*39] $31,803.[24]  Mr. Smith made various adjustments for time, buyer (government or private), size, location (California or Nevada), coverage, development rights, and access (dirt or gravel/paved).  After making his adjustments, he concluded as to the appraisal of High Meadows that "To develop an opinion of value for the subject, considering its larger size, a regression analysis will be employed to forecast a value based on the comparable sales."[25]

In his second appraisal report Mr. Smith valued the approximately 500 acres not subject to the purchase agreement at $6,780,000 as of October 8, 2001.  He used the same six comparable sales and made the same types of adjustments but did not perform a regression analysis.

Underlying both of Mr. Smith's reports were a number of extraordinary assumptions.  In his first appraisal report he assumed, among other things, "[t]hat legal access is sufficient to accommodate a minimum of two residential sites from the subject to a public access" and "[t]hat upon termination of the Williamson Act Contract, a minimum of two residential sites can be legally placed on the

---

[24]The sale of 1,789.33 acres of High Meadows to ALC was sale 25 on Mr. Smith's original list of 36 comparables.  As a result, the parties sometimes refer to that sale as "sale 25".

[25]Regression analysis is a statistical analytical technique that examines the relationship between two selected variables, here size of the parcel in acres and price.

**[\*40]** property." In his second appraisal report he assumed, inter alia, "[t]hat legal access is sufficient to accommodate a minimum of one residential site from the subject to a public access". These extraordinary assumptions were necessary because in both appraisal reports he acknowledged that "The property has no public access" and predicated his appraisal "on the subject having legal access across intervening Federal lands to public roads within the Montgomery Estates Subdivision." He concluded that High Meadows' highest and best use was "Large Parcel Residential Estate Development".

### 2. The Estate's Experts

#### a. Dr. Thomas F. Cargill

Dr. Cargill has a Ph.D. in economics from the University of California, Davis. He is a professor of economics at the University of Nevada, Reno. He has expertise in statistics and regression analysis.

Dr. Cargill found "four fatal flaws with Mr. Smith's statistical work." Those "flaws" pertain to the small sample size and Mr. Smith's purported overreliance on the High Meadows sale, which Dr. Cargill deems an "outlier" because of its size in relation to the other comparable sales. Dr. Cargill also criticizes Mr. Smith's regression analysis:

[*41] Mr. Smith did not provide statistics on the degree of confidence one can attach to the two estimated regressions used to determine the value of High Meadows. This is an egregious omission with serious consequences. At a minimum, the presentation is unprofessional and would not be accepted even in an elementary statistics class for any discipline. Examination of the statistical reliability of Mr. Smith's regressions indicates both regressions should be rejected based on standard levels of statistical confidence used by researchers who conduct this type of analysis. The lack of statistical reliability means that either regression generates so wide an "ark of predictability" [as to the fair market value] of the High Meadows property as to be meaningless.

Dr. Cargill also opines that Mr. Harrison's appraisal of December 11, 2002, valuing High Meadows as of September 12, 2002, used by USFS to establish the value of High Meadows, for purposes of its January 31, 2003, purchase of that property from ALC for $29,500,000, was similarly flawed. The reason being that

> There is a statistically meaningful relationship between price and size using Mr. Smith's data; however, it is not a reliable foundation to predict the price of large sized property. In a similar vein, this issue also applies to Mr. Harrison's appraisal. Mr. Harrison did not undertake any statistical analysis like Mr. Smith; however, he makes a gross error in valuing High Meadows because he ignores the relationship between price and size.

> Mr. Harrison assumes there is no relationship between size and price and multiplies the average price for the selected comparables by the number of acres in the High Meadows property to obtain a value of $31,146,200. He adjusts this value for installing access and utilities and concludes the rounded final value of the property is $29,500,000 (page 74).

[*42] Mr. Harrison's comparable sales suggest a statistically significant relationship which is more firmly demonstrated with Mr. Smith's data above.  Unfortunately, Mr. Harrison has only 7 comparable sales and it is generally not advisable to estimate a regression based on such a small sample.

### b.    Gary D. Midkiff

Mr. Midkiff has a bachelor of science degree in forest resources from the University of Georgia.  He has his own planning and permitting consulting firm.  He assists clients in the planning and permitting of projects requiring TRPA approval.  Mr. Midkiff worked for TRPA for about 7 years before leaving to start his own business.  He was acting director of TRPA for 2 years and left as assistant director.

The estate asked Mr. Midkiff to evaluate High Meadows' development potential "based on the regulatory environment and advise as to whether the evaluations that were done * * * reflected the regulatory environment."  According to Mr. Midkiff, as of the relevant valuation dates, no building sites had been identified or evaluated for IPES scores and no allowable land coverage for any building sites had been sought or received.  His assessment of High Meadows' development potential on the relevant valuations dates led him to criticize Mr. Smith's reports as reflecting "a poor knowledge and understanding of the Tahoe

**[\*43]** regulatory environment as a whole, and the application of TRPA regulations specifically to the subject property and its circumstances."

####     c.     Steven J. Herzog

Mr. Herzog has a bachelor of science degree in forestry from Northern Arizona University and a master of science degree in forestry with a minor in statistics from Oregon State University. When he prepared his first appraisal report for the estate, he was an MAI member and the president of his own real estate appraisal firm in Modesto, California. By the time he testified at trial in December 2007, he had dissolved his business and had moved to Portland, Oregon, to become a review appraiser for the Appraisal Services Directorate of the U.S. Department of the Interior. He had historically undertaken a number of appraisal engagements for USFS, some of which were for the Lake Tahoe Basin, before being selected for his new job.

Mr. Herzog prepared three review appraisal reports for the estate. One, dated July 19, 2007, is a review appraisal of Mr. Harrison's December 11, 2002, appraisal report. The other two, dated December 10, 2007, are review appraisals of Mr. Smith's reports.

Mr. Herzog found "many flaws" in Mr. Harrison's appraisal report. The three "primary ones" were (1) that Mr. Harrison did not perform a before and after

**[\*44]** analysis;[26] (2) that Mr. Harrison did not look outside the Lake Tahoe Basin for comparable sales;[27] and (3) that Mr. Harrison used land coverage as a unit of comparison rather than as an adjustment item.

Mr. Herzog criticized Mr. Smith for his extraordinary assumptions in both appraisal reports: "The ramifications of any one of these assumptions proving to be not valid are enormous from a valuation perspective. It appears that insufficient research was performed to reach conclusions about the validity of these assumptions." Although Mr. Herzog acknowledged that "Legal access over [USFS] land is probable", he opined that it was "far more unlikely" that USFS would allow such "access to be improved and paved" and would "allow

---

[26]A before and after analysis would have valued all of High Meadows before the USFS sale and the 566-acre portion of High Meadows that remained in the family's possession after the sale. Such an analysis is most often used in the conservation-easement context and in the takings context where something less than the owner's full interest in the property is taken. This approach necessarily considers the effect of the transfer or gift itself on the value of the retained property. See, e.g., sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs.

[27]Later in his report Mr. Herzog launched into a detailed criticism of the comparable sales used by Mr. Smith. For example, Mr. Herzog asserted that those sales were not affected by the Williamson Act, included a "preponderance of sales to government agencies" without proper confirmation they were at fair market value, and would have had lower development costs because they were at lower elevations with easier seasonal access.

**[\*45]** utilities to be run across its land to facilitate residential development", both of which are mandatory TRPA requirements for residential development.

###### d. Steven R. Johnson

Mr. Johnson is a licensed real estate appraiser in California and Nevada. He is also president of Johnson-Perkins & Associates, Inc., a real estate appraisal and consulting firm with a staff of 12 appraisers. Mr. Johnson has a bachelor of science degree in business administration (with a major in real estate) from the University of Nevada, Reno.

Mr. Johnson's appraisal report served as the basis for the value of High Meadows reported on the estate tax return. In addition, Mr. Johnson prepared four reports at the estate's request during the course of these proceedings. One values High Meadows as of June 27, 2000. Another values High Meadows as of October 8, 2001. The third, titled "A Critique of the U.S. Forest Service Purchase", criticizes the January 2003 $29,500,000 purchase price and Mr. Harrison's report upon which that purchase price was based. The fourth report is a rebuttal report addressing Mr. Smith's appraisal reports.

Mr. Johnson valued High Meadows at $7.4 million (excluding timber) as of June 27, 2000, $2.6 million for an undivided one-half interest, if sold separately, and at $8 million (excluding timber) as of October 8, 2001. Like Mr. Smith, Mr.

**[*46]** Johnson used a comparable sales approach. Mr. Johnson's comparable sales were seven "large acreage land sales" that occurred between January 5, 1999, and April 12, 2001. The subject parcels ranged in size from 915.9 acres to 2,330 acres and in price per acre from $1,288 to $3,222. They had potential development of 25 to 146 homes. Some of the subject parcels are in California and some are in Nevada. <u>Notably, none is in the Lake Tahoe Basin</u>.

Recognizing the uniqueness of the Lake Tahoe Basin, Mr. Johnson "conducted an extensive sales search in an attempt to find sales within the Tahoe Basin of similar sized properties." Because the nearest comparable sales in the Lake Tahoe Basin involved properties "10 times smaller" than High Meadows and because Mr. Johnson believed that High Meadows' development potential did not increase with its size, he concluded that "the sales of much smaller parcels within the Lake Tahoe Basin were not felt to be indicative of the Market Value of the much larger subject property."

Mr. Johnson ultimately concluded that High Meadows' highest and best use for TRPA purposes was "Six potential residential homesites" and for Williamson Act purposes was "One agriculturally oriented home over the next 10 years". As for value, he concluded that High Meadows was worth between $2,800 and $3,000

[*47] per acre as of June 27, 2000, and between $3,000 and $3,200 per acre as of October 8, 2001.

In his third report, Mr. Johnson criticized Mr. Harrison for not considering sales outside the Lake Tahoe Basin. He also noted that "the highest single price ever paid for a nonlakefront homesite in the Lake Tahoe Basin is $4,500,000" and criticized Mr. Harrison for focusing on 238 acres of high-capability land that Mr. Harrison valued at $125,000 per acre:

> It has been my observation in my 37 years of appraisal experience that a buyer acquiring a single-family residential homesite will base their purchase decision on a price per homesite rather than a price per acre basis. With larger sites, a buyer will typically make some additional minimal allowance for larger parcels as they tend to provide greater privacy, separation, and seclusion. It would require a large leap of logic to assume that a buyer would increase the price they are willing to pay for a homesite within the Lake Tahoe Basin to nearly $30,000,000 simply based upon the added forest land which surrounds the property.

In his fourth report, Mr. Johnson criticized Mr. Smith for not addressing the impact on value of any of Mr. Smith's extraordinary assumptions.

e.     William G. Kimmel

Mr. Kimmel has a bachelor of arts degree in economics from Stanford University. He has been a real estate appraiser in Nevada since 1961 (self-employed since 1968). He prepared two review appraisal reports for the estate--

[*48] one (dated October 10, 2007) of Mr. Johnson's appraisal reports[28] and the other (dated November 30, 2007) of Mr. Smith's appraisal reports.

His general opinion was that Mr. Johnson's "value conclusions appear reasonable" but that "Mr. Harrison has valued the property based upon a series of assumptions which in effect could be considered entitlements, yet they have not occurred."[29]  Because High Meadows was under significant development restrictions, Mr. Kimmel disagreed with Messrs. Johnson and Harrison insofar as they valued the property using price per acre as their unit of comparison.  Mr. Kimmel would have compared High Meadows "with other sales on a per-site basis."

In his other report, Mr. Kimmel criticized Mr. Smith for, among other things, Mr. Smith's extraordinary assumptions and for overreliance on the January 2003 sale to ALC, which was based on the value determined by Mr. Harrison in his December 11, 2002, report.

---

[28]As part of his appraisal of Mr. Johnson's reports, Mr. Kimmel reviewed Mr. Harrison's December 11, 2002, appraisal report.

[29]In fact, Mr. Kimmel opined that Mr. Johnson might have overappraised High Meadows in his original report because Mr. Johnson did not discuss the Williamson Act and its potential 10-year impact on the property's value.

**[*49]**              f.      <u>Thomas W. Clark, Jr.</u>

Mr. Clark currently heads his own real estate appraisal consulting firm, Thomas Clark Co., Inc.  He has been in the real estate appraisal business since 1957.  He received his MAI designation in 1969 and is licensed as a real estate appraiser in California, but not in Nevada.  He has testified frequently as an expert in real estate valuation matters in both State and Federal courts.  As previously noted, his involvement with this matter arose when he was retained by ALC to conduct a review appraisal of Mr. Harrison's October 10, 2001, appraisal.  He was called by the estate with respect to that review appraisal.  His testimony at trial was more extensive than his written report and inter alia also addressed the access issue at High Meadows.

V.      <u>Values of High Meadows for Estate and Gift Tax Purposes</u>

The ultimate question that we are called upon to answer is deceptively simple:  How much was High Meadows worth on June 27, 2000 (for gift tax purposes), and on October 8, 2001 (for estate tax purposes)?  As is all too typical in valuation cases, the parties have taken widely divergent self-serving views of High Meadows' values as of the relevant valuation dates.  Petitioner argues that High Meadows was worth $7.4 million as of June 27, 2000, and $8 million as of

[*50] October 8, 2001. Respondent argues that High Meadows was worth $25,185,000 as of June 27, 2000, and $36,280,000 as of October 8, 2001.[30]

The Supreme Court observed long ago that "At best, evidence of value is largely a matter of opinion, especially as to real estate." Montana Ry. Co. v. Warren, 137 U.S. 348, 353 (1890). That statement is as true now as it was over 12 decades ago.

Sales of comparable properties are credible evidence of real estate's fair market value. See Fairfield Gardens, Inc. v. United States, 306 F.2d 167, 172-173 (9th Cir. 1962), noting that "In the field of real estate valuation it has long been the rule that sales of other property are not admissible unless the other property is comparable. And comparability, while it does not mean identity, because each parcel of real property differs from every other parcel, does mean, at the very least, similarity in many respects." There is normally no comparable sale superior to the arm's-length sale of the subject parcel itself in an open market transaction within a reasonable time of the relevant valuation date(s).

---

[30]The $36,280,000 represents the $29,500,000 sales price for 1,790 acres of High Meadows plus the $6,780,000 that Mr. Smith's appraisal report determined the retained 566.77 acres was worth. The Court, as a practical matter, concludes one or both of Mr. Smith's values is materially mistaken. Although no diamonds, gold, or oil was found on High Meadows between June 27, 2000, and October 8, 2001, inexplicably Mr. Smith concludes the value increased by a little more than 44% in slightly more than 1 year, despite the tragic events of 9/11.

[*51]  Both parties used comparable sales analyses to value High Meadows. Respondent relies almost exclusively on the January 2003 sale of a large portion of High Meadows to ALC, while the estate denigrates it and urges us to disregard it. We will not disregard that sale, as it is undoubtedly some evidence of High Meadows' values for estate and gift tax purposes.  See First Nat'l Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir. 1985); Estate of Kaplin v. Commissioner, 748 F.2d 1109, 1111 (6th Cir. 1984), rev'g T.C. Memo. 1982-440; Trout Ranch LLC v. Commissioner, T.C. Memo. 2010-283, aff'd, ____ Fed. Appx. ____, 2012 WL 3518564, at *7-*8 (10th Cir. Aug. 16, 2012); Estate of Shlensky v. Commissioner, T.C. Memo. 1977-148 (relying on the sale of a building 15 months after death).

A.    The January 31, 2003, Sale of High Meadows as Some Evidence of High Meadows' Values for Estate and Gift Tax Purposes

1.    Evidence of the Sale Is Admissible.

Although this Court has observed that subsequent events are generally irrelevant (and therefore inadmissible) in determining a property's fair market value as of a relevant valuation date, that observation is generally inapplicable when the subsequent event is a sale of the subject property itself within a reasonable time of the relevant valuation date.  See Estate of Spruill v.

[*52] Commissioner, 88 T.C. at 1228, 1233; see also Saltzman v. Commissioner, 131 F.3d 87, 93 (2d Cir. 1997), rev'g T.C. Memo. 1994-641.  Indeed, "evidence of actual price received for property in the estate after the date of death is generally admitted without any discussion of the rule against admission of post-valuation date events."  First Nat'l Bank of Kenosha, 763 F.2d at 894; see Estate of Kaplin v. Commissioner, 748 F.2d at 1111 (reversing a Tax Court decision because the Tax Court failed to consider a sale of the subject parcel itself two years after the donation of the parcel); Estate of Hillebrandt  v. Commissioner, T.C. Memo. 1986-560 (admitting evidence of sales of the various parcels of the subject property that occurred five years after the decedent's death);[31] see also Estate of Jung v. Commissioner, 101 T.C. 412, 431 (1993); Trout Ranch LLC v. Commissioner, T.C. Memo. 2010-283; Estate of Brown v. Commissioner, T.C. Memo. 1969-91, aff'd, 425 F.2d 1406 (5th Cir. 1970).

However, there is an exception where "a material change in circumstances occurs between the valuation date and the date of sale."  Estate of Keitel v. Commissioner, T.C. Memo. 1990-416.  In short, we will not consider subsequent

[31]For purposes of determining the fair market value of property, the Court has even admitted subsequent sales of other comparable properties.  See Estate of Jung v. Commissioner, 101 T.C. 412, 431 (1993); Estate of Brown v. Commissioner, T.C. Memo. 1969-91, aff'd, 425 F.2d 1406 (5th Cir. 1970).

**[\*53]** events that affect a property's value, but we will consider subsequent events which merely serve as evidence of a property's fair market value as of the relevant valuation date.[32]  See Estate of Jung v. Commissioner, 101 T.C. at 432 ("When viewed in this light--as evidence of value rather than as something that affects value--later-occurring events are no more to be ignored than earlier-occurring events.").

Citing an aforementioned case, on July 11, 2008, we denied the estate's March 25, 2008, amended motion to strike from the record evidence of the January 31, 2003, sale of High Meadows.  We concluded that evidence of the January 2003 sale is admissible on the issue of that property's fair market values on June 27, 2000--2-1/2 years earlier--and on October 8, 2001--16 months earlier.  See First Nat'l Bank of Kenosha, 763 F.2d at 894; Estate of Kaplin v. Commissioner, 748 F.2d at 1111.

We reiterate that the sale of most of High Meadows to ALC 2 years and 7 months after the date of the gift and about 16 months after the date of Shirley's

---

[32]In First Nat'l Bank of Kenosha v. United States, 763 F.2d 891 (7th Cir. 1985), the Court of Appeals for the Seventh Circuit explained this point using an example.  The unexpected discovery of oil on the land after the decedent died would be inadmissible to prove the value of the property on the date of death, whereas the actual sale price received within a reasonable time after the date of death would be admissible in the absence of the discovery of oil or some other unanticipated intervening event that materially affected the property's value.

[*54] death was reasonably close to both relevant valuation dates. Nothing that could not have been foreseen, other than the result of Mr. Harrison's appraisal, using extraordinary assumptions as directed by USFS, occurred between the relevant valuation dates and January 31, 2003, that drastically or materially affected High Meadows' intrinsic value so as to render the sale irrelevant.[33]

On brief the estate cites Estate of Ridgely v. United States, 180 Ct. Cl. 1220 (1967), in an attempt to demonstrate that High Meadows underwent radical changes between the relevant valuation dates and the date of the January 2003 sale so as to render that sale not probative. While some changes did occur, we are not persuaded that they were sufficient to eliminate the sale's probative value.

Estate of Ridgely is inapposite to the estate's case. When Mabel Lloyd Ridgely died, her assets included a 368-acre farm near Dover, Delaware, known as Eden Hill Farm. See Estate of Ridgely, 180 Ct. Cl. at 1223. Almost a month after Mabel Ridgely died, the General Foods Corp. retained an agent "to locate a site for a new plant for its Jell-O Division." Id. at 1228. General Foods then entered into an option agreement to acquire approximately 112 acres (later changed to 116

---

[33]The only other truly important events which occurred were the receipt by USFS of sufficient spending authority and budget approval to accomplish the High Meadows purchase and the negotiation and formalization of the reciprocal easement agreement between the parties. Given USFS' interest in High Meadows, this was hardly unforeseeable, although they were both critical to the deal.

**[\*55]** acres) of the Eden Hill Farm.  See id. at 1228, 1230.  Months later, General Foods reached an agreement with the City of Dover under which the City of Dover would expend a large amount of money "in order to induce General Foods to locate its plant in the Dover area".  Id. at 1239.

The City of Dover did as General Foods requested, and General Foods eventually acquired 116 acres of Eden Hill Farm without even having it appraised. In rejecting the Government's argument that Eden Hill Farm's value on the date of Mabel Ridgely's death should have been determined by reference to the subsequent sale to General Foods, the Court of Claims concluded that there was "not a scintilla of evidence in the record" that as of the date of Mabel Ridgely's death

> it could have reasonably been foreseen by even the most optimistic of real estate speculators (1) that a large national corporation would, within eight months, exercise an option to acquire 116 acres of Eden Hill Farm, and (2) that to assure consummation of the transaction, the City of Dover would commit itself to expend over $900,000 for extensions of sewer and water systems to accommodate that corporation.  * * *

Id. at 1238-1239.

In short, the Court of Claims concluded that, at the time that Mabel Ridgely died, it could not have been reasonably foreseen that Eden Hill Farm's highest and best use would be rapidly transformed from agricultural to industrial use.  The

**[*56]** court nevertheless concluded that Eden Hill Farm was worth $265,000 (rather than the $137,100 reported by Mabel Ridgely's estate) because its highest and best use on the date of Mabel Ridgely's death "was for agricultural purposes with an industrial potential". Id. at 1236-1237.

In contrast, the allegedly unforeseeable significant changes between the relevant valuation dates and the date of the January 2003 sale of 1,790 acres of High Meadows to ALC were reasonably foreseeable, if not in fact foreseen. As of the relevant valuation dates, access issues, the fact that High Meadows contained a contaminated site, and the lack of (1) a road; (2) utilities; (3) a verified determination of land capability and coverage; (4) an IPES score; (5) a building allocation; and (6) certificated parcels were all either known or potentially knowable.

In declining to strike evidence of the January 31, 2003, sale of High Meadows, we stated that we were not deciding whether the October 4, 2001, purchase agreement constituted a binding contract to sell High Meadows under California law that remained in effect until the sale closed more than a year later. Although the parties continue to dispute that issue, we need not decide it. As explained, we will consider subsequent events which merely serve as evidence of the property's fair market value as of a relevant valuation date. Evidence of the

**[\*57]** January 31, 2003, sale of High Meadows is, therefore, admissible irrespective of any decision that we would render on the contract law issue. Trout Ranch LLC v. Commissioner, 2012 WL 3518564, at \*6-\*7. Evidence regarding the sale of High Meadows is admissible whether the purchase agreement constituted a binding contract, a letter of intent, an option agreement, or something else. And such evidence is admissible regardless of whether the parties remained in contract or went out of contract and then got back in.[34]

Because we have already admitted evidence about the sale into the record, we have answered affirmatively the question of whether we will consider the sale in determining High Meadows' values for estate and gift tax purposes. However, in keeping with our order denying the estate's motion to strike, we reiterate that

---

[34]Indeed, respondent is not relying on the purchase agreement to demonstrate the fair market value of High Meadows on June 27, 2000, or October 8, 2001, only "to demonstrate that the sale of High Meadows was foreseeable as of the dates of valuation." Such a demonstration is unnecessary: The sale need not have been foreseeable in order to render it relevant (and the evidence therefore admissible). The sale is relevant (and the evidence admissible) as long as there were no intervening events between the relevant valuation dates and the date of sale that materially affected the property's intrinsic value. Moreover, High Meadows' fair market values on the relevant valuation dates cannot be determined solely on the terms of the purchase agreement. The ultimate sale price was not known until well after Shirley's death and was based on Mr. Harrison's December 11, 2002, seriously flawed appraisal report, which valued High Meadows as of September 12, 2002 (well after both of the relevant valuation dates).

**[\*58]** the probative value of the $29,500,000 sale price in relation to petitioner's evidence is "an entirely different matter".

      2.      <u>The January 2003 Sale Is the Best Evidence of Value</u>.

In the absence of contrary evidence, we accept, as we do with valuations by the Customs Service, <u>Ross Glove Co. v. Commissioner</u>, 60 T.C. 569, 605 (1973), that USFS appraised this property before purchasing it as required by 42 U.S.C. sec. 4651 (2006). The effect of another U.S. office or agency's determination of value on our tax determination depends on the facts of each case. We are not required to apply another office or agency's determination where it is based on erroneous assumptions or mistaken facts or an unreasonable formula. <u>Brittingham v. Commissioner</u>, 66 T.C. 373, 403 (1976), <u>aff'd</u>, 598 F.2d 1375 (5th Cir. 1979).

That said, the January 2003 sale to ALC is the only truly comparable sale worthy of consideration. We will not shun the sale of a large portion of High Meadows reasonably close to the relevant valuation dates in favor of comparable sales that are not truly comparable and that must undergo a series of dramatic speculative adjustments in order to render them the least bit reliable.

Privately owned parcels comparable in size to High Meadows do not exist in the Lake Tahoe Basin. Indeed, at the time it was sold, High Meadows was the largest private land holding in the Lake Tahoe Basin. As Mr. Clark noted in his

[*59] December 31, 2001, review appraisal: "There simply are no sales of land that are truly comparable to the High Meadows land." And, as Mr. Johnson himself acknowledged in his considerably earlier appraisal report for USFS valuing High Meadows as of April 10, 1990,

> The real estate market within the Lake Tahoe Basin is considered to be highly unique and atypical of most other areas This uniqueness associated with the Lake Tahoe market is attributed to a number of factors including strict development controls which limit supply as well as the unique year-round recreation and entertainment amenities associated with the Lake Tahoe Basin. An extensive review of the sales data contained in our files revealed no data from other areas with a sufficient degree of comparability to be useful in this analysis. Even if such data were available, it is felt that locational adjustments would involve an unacceptable degree of subjectivity.

For that reason, when he valued High Meadows in 1990, Mr. Johnson used comparable sales of much smaller properties all within the Lake Tahoe Basin. Yet, in preparing his report valuing High Meadows as of October 8, 2001, Mr. Johnson relied exclusively on comparable sales outside the Lake Tahoe Basin. All of those sales involved large parcels of land in other areas of California and Nevada. Those properties were not closely comparable to High Meadows with respect to their location and desirability. They also do not reflect the significant interest of environmental organizations and governmental entities in Lake Tahoe Basin properties, which inevitably affects price because of increased demand.

**[\*60]** Nevertheless, in a relatively contemporaneous appraisal of an unrelated 311-acre property called Meadows Edge in the Lake Tahoe Basin, Mr. Johnson used "comparable sales" in the Lake Tahoe Basin that were 10 to 20 times smaller than the subject parcel. Mr. Johnson had a similar instance for another 189.5-acre property in the Lake Tahoe Basin called Sunset Ranch where Tahoe Basin comparables were 12 to 21 times smaller than the subject property.

There are other reasons to question the probative value of Mr. Johnson's reports. Mr. Johnson's view of High Meadows' accessibility changed considerably between 1990 and 2007 even though conditions on the ground did not. In 1990 he made no mention of access problems across Federal land. In contrast, in his valuation report for purposes of this case, access across USFS land, particularly with respect to utility easements, is a significant problem. In 1990 Mr. Johnson characterized the views of Lake Tahoe from portions of High Meadows as "excellent dramatic lake and mountain" views. He now characterizes those views as "distant". He loosely attributes the contradictions, at least in part, to his former associate, an English literature professor with flowery writing tendencies.[35]

---

[35]Although those characterizations are subjective and, therefore, not necessarily incompatible, Mr. Johnson's recharacterization tends to make him appear an advocate for the estate's position who has not fully accepted that the

(continued...)

**[\*61]** <u>See</u> <u>Laureys v. Commissioner</u>, 92 T.C. 101, 129 (1989) ("In the context of valuation cases, we have observed that experts may lose their usefulness (and credibility) when they merely become advocates for the position argued by a party.").

In contrast to Mr. Johnson's comparable sales, all of Mr. Harrison's comparable sales were of parcels within the Lake Tahoe Basin and were generally at much lower elevations with less rugged terrain. Similarly, Mr. Smith's comparable sale properties (aside from the January 2003 sale to the ALC of a large portion of High Meadows itself) were qualitatively comparable, except for elevation,[36] to High Meadows with respect to their location and desirability. But they too were not comparable to High Meadows in size--High Meadows dwarfed those properties. This size discrepancy, in his opinion, necessitated a regression

---

[35](...continued)
firm's appraisal reports necessarily require that it candidly accept responsibility for its work product, which in turn affects its credibility.

[36]Elevation is important here, because of the access problems to the higher steep slope areas and the "lapse rate" (i.e., effect of surface and atmospheric compressional heating which generally means ambient outside temperature will decline 3.5 degrees, on average, per 1,000 feet of altitude). The temperature differential in this alpine environment significantly affects snow depth, the snow line, accessability, and livability.

**[\*62]** analysis, which Mr. Smith himself has acknowledged <u>is highly unreliable most of the time</u>.[37]

In the end, the dissimilarities between High Meadows and the parcels that were the subjects of the comparable sales other than the sale of 1,789.33 acres of High Meadows itself to ALC "seem to us far more striking than the similarities." <u>Fairfield Gardens, Inc.</u>, 306 F.2d at 173.  Thus, the most probative valuation evidence before us is the January 2003 $29,500,000  sale price paid by ALC for a large portion of High Meadows.  That said, there is ample reason to question how reflective of fair market value that sale price was, as we agree with the estate that the $29,500,000 sale price was premised on a seriously flawed appraisal report and was negotiated by parties that were not truly adverse.  Consequently, to a meaningful extent valuing High Meadows, on the date of Shirley's death, or as of June 27, 2000, using the January 2003, sale begs the question.  As explained below, these facts warrant considerable adjustment and discount in the determination of the estate and gift tax values at issue here.

---

[37]At trial Mr. Smith acknowledged that his linear regression analysis had a 37% accuracy level and that his nonlinear regression analysis had a 50% accuracy level.  He also acknowledged that <u>without his regression analysis he would have been unable to develop a definitive opinion as to value</u> but that the data supported a value of less than $13,022 per acre.

**[*63]** B.    <u>Other Significant Factors Affecting High Meadows Valuation</u>

     1.    <u>Highest and Best Use</u>

The parties agree that, absent governmental approval and payment of a significant termination charge as of both relevant valuation dates, the Williamson Act, a.k.a. the Trimmer, contract limited development on High Meadows to one house.[38]  They disagree as to whether that house could have been the immense "trophy house" referred to by Mr. Harrison or whether it was required to be something far more modest.

The Williamson Act restricted High Meadows' use "to agricultural and compatible uses", and the parties' disagreement as to the size or type of house that could be constructed on High Meadows relates to the contract specification that "Structures may be erected on the property (and existing structures enlarged) if they are directly related to and compatible with permitted uses."  The estate asserts that a large luxury estate would have been precluded by the Williamson Act contract because it was not agriculturally related.  Respondent counters that

---

[38]A separate lodging accommodation for High Meadows Ranch workers may also have been permitted.  After High Meadows was split up, the one development right went to USFS as an aspect of its High Meadows purchase.  The 566 acres retained by the family lacks any development right under the Williamson Act.

[*64] "Nothing in the Williamson Act would limit the size of any allowed [single family] residential construction."

At trial Roger Trout, a principal planner and 17-year employee of the El Dorado County Planning Department, testified that as of the relevant valuation dates there were no size limitations imposed on residences in El Dorado County. He also stated that "The issuance of a building permit" was "a ministerial action" and that it did not "include the review of the continued agricultural activities or compliance with the Williamson Act." The estate has been unable to demonstrate otherwise. In short, a rancher or farmer need not live in a log cabin.

We agree with respondent that as of the relevant valuation dates, a purchaser of High Meadows would have been allowed to construct one single family residence of practically any residential size on the property.[39] Nevertheless, as explained below, we conclude that a private buyer seeking to build a single "trophy house" would have been willing to purchase 1,790 acres of High Meadows only for a significantly lower price than $29,500,000.

---

[39]Mr. Johnson and the estate's other experts incorrectly concluded that the Williamson Act contract precluded the construction of a large luxury residence on High Meadows.

**[\*65]**      2.      <u>Access Issues and Changing USFS Policies</u>

The Trimmer and Giovacchini families have apparently encountered no notable access issues actually occurring with respect to High Meadows since its acquisition in 1929. Nevertheless, notwithstanding Mr. Harrison's conclusion that "the right of way is an unchallenged fact", there were, as of June 2000, and at the time of Shirley's death, significant questions concerning the property owner's right to such access. Historical landowner use and USFS acquiescence or indifference is not a meaningful predictor or assurance of future use or access.

The access difficulties particularly complicate the valuation issue. The Court intuits that if a purchaser of High Meadows was willing to develop and use High Meadows in a manner consistent with USFS desires and those of surrounding neighbors and other environmentally conscious voters, the access issue would, as in fact it did, get resolved by negotiation.[40] However, if a

_____

[40]One and a third years after Shirley's death, in conjunction with, and as a condition of closing, the sale of the 1,790 acres to ACL and hence to USFS in 2003, which sale was to include the one single development right, the Giovacchini parties executed a reciprocal access easement deed with respect to both parcels of High Meadows. USFS for its part also, as a condition of closing, executed and delivered to the estate and HM6 a written, notarized grant deed suitable for recording. The deed provided a "non-exclusive easement for use of a road, whether existing or as constructed or reconstructed, over and across" a 55-foot-wide strip about six-tenths of a mile long extending public access from the existing Montgomery Estates Subdivision to High Meadows.

(continued...)

**[\*66]** purchaser wished to build a large and ostentatious home with a view and/or

conduct high-occupancy or high-density activities on High Meadows that could

adversely affect its watershed or wilderness atmosphere, the result would likely be

---

[40](...continued)

The parties also negotiated and executed a road maintenance agreement covering the access road. While the parties, as a critical aspect of the overall deal, compromised and worked hard together to negotiate and finalize these documents, the task was not an easy one. Numerous letters, meetings, and discussions were required over a period stretching from July 18, 2002, until January 30, 2003. Among the disputes which were ultimately resolved were: (1) the width of the easement, 30 feet, 55 feet, or 60 feet; (2) road maintenance responsibilities; (3) boundary line adjustments; (4) public utility easement to be located along the road easement; (5) "protect[ion] and [maintenance of] the streams, riparian corridors, and sensitive meadow systems unique to the High Meadows area;" (6) maintenance of "the hydrologic functions of ground water of Cold Creek"; (7) "protect[ion of] the assets of this property including its riparian rights and spring sources;" (8) livestock access across High Meadows including cattle drinking on Cold Creek resulting in "fecal coliform" pollution in the basin of great concern to USFS; (9) "cut bank erosion * * * from moving cattle across and around Cold Creek" over what would then be USFS property particularly as it affects "potential resource damage"; (10) "the erosion occurring not only in the High Meadows area but also along the steep slope to the north"; and (11) location of and protecting "Freel Spring".

These issues, because they dealt with USFS roads, point and nonpoint pollution, the Clean Water Act, and water quality as affected by runoff, were then and remain today extremely divisive high profile issues. See, e.g., Northwest Envl. Def. Ctr., Inc. v. Brown, 640 F.3d 1063 (9th Cir. 2011), cert. granted, ____ U.S. ____, 133 S. Ct. 23 (2012); Envl. Def. Ctr., Inc. v. United States, 344 F.3d 832, 860-863 (9th Cir. 2003).

[*67] quite different.[41]  Yet a fee simple owner acquires significant right to use his or her property however he or she wishes, consistent with zoning and land use restrictions.  All material restrictions on general property rights are likely to affect value.

Because of this complication, a willing buyer or seller aware of all relevant facts and given the tens of millions at stake would investigate analogous factual access situations to predict possible and likely outcomes.  Today, they would discover from Federal court pleadings and opinions or other news, statutory or regulatory sources the following experiences.

    a.    McFarland's Case:  Snow Shoes, Dog Sled, and Cross Country Skis

John McFarland owned a 2.75-acre plot, including a residence, within and surrounded by Glacier National Park, which had been a part of an 89-acre parcel conveyed to his predecessor in interest, in 1916, by a Federal patent under the Homestead Act of 1862.  The property had been homesteaded before the creation

---

[41]A large flashy home with a view of the basin and lots of reflective glass or sheeting would also be conversely visible by many in the basin.  Some of those individuals would likely object to its disruption of their otherwise pastoral view of the basin skyline.  High density entertainment and related outdoor activities at a trophy residence would likely affect noise levels, runoff and water quality, etc., precipitating USFS consideration of restrictions or limitations on access permit, easement grants, and utility easement grants.

[*68] of the park in 1910. The patent stated: "TO HAVE AND TO HOLD the said tract of Land, with the appurtenances thereof, unto the said claimant and to the heirs and assigns of the said claimant forever." For 70 years Mr. McFarland and his predecessors accessed their property via Glacier Route 7, a road which passes through the national park, without USFS interference. Beginning in 1975, the USFS prohibited snowmobiling in Glacier National Park and generally closed Glacier Route 7 to automobiles during the winter season but continued, until 1999, to allow property holders some degree of motorized access in winter months. Use of Glacier Route 7 in the winter was apparently allowed because the Homestead Act guaranteed access to patent holders.

In December 1999 USFS notified Mr. McFarland it would no longer countenance motorized winter access via Glacier Route 7. USFS stated it changed its policy to protect wildlife and public recreational opportunities. Mr. McFarland then filed an application for a special use permit. He asked for year-round permission for family and guests to drive on Glacier Route 7 and to use a snowmobile when "road conditions make it unsafe or impractical to drive."

USFS denied the permit request, and his administrative appeal was also denied. USFS explained that motorized access and snowmobiling are "an incompatible public use" during the winter in Glacier National Park. USFS

**[\*69]** contended that the Superintendent can close roads and prohibit motorized access "for the maintenance of public health and safety, protection of environmental or scenic values, protection of natural or cultural resources, aid to scientific research, implementation of management responsibilities, equitable allocation and use of facilities, or the avoidance of conflict among visitor use activities." Mr. McFarland then sued in the U.S. District Court in Montana to quiet title to an easement over Glacier Route 7. He claimed an easement by necessity, an implied easement from the Homestead Act, and an express easement pursuant to the original land patent. The District Court dismissed the case. McFarland appealed, and the Court of Appeals for the Ninth Circuit reversed and remanded the case. See McFarland v. Norton, 425 F.3d 724,729 (9th Cir. 2005).

On remand, the District Court granted summary judgment for the USFS, and Mr. McFarland again appealed. The Court of Appeals ruled that "Under the Administrative Procedure Act, an agency decision will be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" McFarland v. Kempthorne, 545 F.3d, 1106, 1110 (9th Cir. 2008) (quoting 5 U.S.C. sec. 706(2)(A)). "A federal court may not substitute its judgment for that of the agency." Id. It concluded

[*70] that the district court properly granted * * * summary judgment. McFarland has no valid claim to an easement. To the extent he has a right to access his property across federal land, that right is subject to the reasonable regulation of the Park Service, implemented through the permitting process. * * *

Id. The Court of Appeals then held:

Even where a statutory right of access exists, the Park Service has broad discretion to regulate its use. * * * The proper mechanism for such regulation is the permitting process. * * *

* * * * * * *

* * * Ultimately, the Park Service determined that its concerns for wildlife and recreation in the national park justified closing Glacier Route 7 to motorized vehicles during the winter season.

"If an agency's determination is supportable on any rational basis, we must uphold it." * * * "This is especially true when an agency is acting within its own sphere of expertise." * * *

Id. at 1111; see also Fitzgerald Living Trust v. United States, 460 F.3d 1259, 1263

(9th Cir. 2006); Mackie v. United States, 194 F. Supp. 306, 308 (D. Minn. 1961).

An easement by necessity does not exist if the claimant has another mode of access to his property. * * * In fact, necessity may be defeated by alternative routes or modes of access--no matter how inconvenient. * * * McFarland has year-round access to his property over Glacier Route 7. In the winter, this access is limited to non-motorized means. * * * [E]ven subject to the seasonal limitations imposed by the Park Service and in spite of the associated inconvenience, McFarland enjoys sufficient access to his property. * * *

McFarland, 545 F.3d at 1111.

**[\*71]**          b.          <u>Mackie's Case:  Hiking, Canoe With Portage and Horseback</u>

The <u>McFarland</u> opinion cites <u>Mackie</u> with apparent approval.  George Mackie, commencing in 1945, owned land and two one-room cabins in Glen Lake. <u>Mackie</u>, 194 F. Supp. at 307.  The land was in the Superior National Forest and within the boundaries of a USFS designated "Roadless Area", now accessible only by horseback, boat, or on foot.  <u>Id.</u> at 306.  Before 1952 the airplane was a common means of access, but all air travel was banned in that year.  Following the air ban, Mr. Mackie relied solely on an old Northwest Paper Co., logging road for access to his property that, for part of the way, traveled over government owned land within the "Roadless Area".  <u>Id.</u> at 307.  Initially this was not a problem, but then USFS blocked the road at its entrance to the "Roadless Area" with posts and a steel cable fastened with two locks, one at each end.  One lock was furnished by USFS and used by rangers and other Federal employees for motorized access.   The other lock was furnished by Northwest Paper Co.,  which was authorized to use the road, notwithstanding the general ban, in connection with its logging operations.  A sign advised the road was closed to all vehicular traffic.

In 1951 and 1952 Mr. Mackie had a key to one of the locks which was provided to him by Northwest Paper Co.  When he was required to give this up, he

[*72] resorted to cutting the cable or driving around the posts on an improvised bypass. From 1952 to 1959 he regularly used the logging road without interference by the Government, although the Forest Rangers and other USFS employees knew he was using the road. In May 1959 the Government blew up the road with dynamite, creating a number of holes in the road. Mr. Mackie continued to use the road bypassing some holes and jerry-rigging improvised bridges over others. Where the holes were too wide and/or deep, he procured old autos, parking them between the holes. He would then carry himself, guests, and supplies on foot from one vehicle past the hole to the next vehicle and then proceed to the next impassible hole and repeat the exercise.

Mr. Mackie justified his road use on the allegation that the original patent from the United States conferred on him an easement by necessity as his land was surrounded by the Superior National Forest. Id. at 307-308. By using Gun Lake Road he could drive to within one-third mile of Gun Lake. Id. at 308. From there he could carry supplies and walk to the lake, then boat across the lake to his property. Otherwise, Mr. Mackie had to drive on Gun Lake Road without using the "Roadless Area" portion to the Fourtown area. He then had to travel easterly, without the car, for 1-1/2 miles and then another 1-1/2 miles to Fourtown Lake. He could thereafter travel by boat across Fourtown Lake, Boot Lake, and Fairy

[*73] Lake to Gun Lake and thence to his property. This trip also required three short portages between lakes and covered a total distance between where he needed to leave the car and his cabins of not more than eight miles.

Given these impediments, Mr. Mackie filed a suit, asking for a declaratory judgment that he had lawful rights of access to his land over the Superior National Forest land and was entitled to damages for USFS' restricting his mode of access. Id. at 306. The Government counterclaimed, asking for an injunction preventing Mr. Mackie from crossing the restricted roadway using a motorized vehicle.

The District Court noted: "The general rule of law herein applicable is that one cannot claim an easement by way of necessity over lands to which he has another mode of access, however inconvenient." Id. at 308 (citing 17A Am. Jur., Easements, secs. 61-63). On this basis, the District Court denied all of Mr. Mackie's requested relief and granted judgment and injunctive relief against him and for the Government.

### c. Fitzgerald's Case: Revokable Permit and a Kick Me Annual Fee

The Fitzgeralds, Raymond and Nancy, d.b.a. Hook Cattle Co., owned the O'Haco Cabins Ranch about 55 miles from Winslow, Arizona, which included a residential structure. Fitzgerald v. United States, 932 F. Supp. 1195 (D. Ariz.

[*74] 1996). To access their property they had to cross the Apache-Sitgreaves National Forest. Id. at 1198. The ranch land was acquired by patent on April 26, 1920, from the United States, pursuant to the Homestead Act of 1862. The primary access route was FDR 56B, a two-mile forest development road. The Fitzgeralds also acquired the Pius Farms Ranch, which, with the O'Haco Cabins Ranch, constituted the "base property" to support a USFS grazing permit covering 65 square miles of Sitgreaves National Forest. The permit was intended to support a 915-head-of-cattle allotment known as the "Limestone Grazing Allotment". Id. at 1198 n.1. Shortly after the Fitzgeralds purchased the O'Haco Cabins Ranch in 1983, USFS closed several other access roads to their property. Id. at 1199.

In the spring of 1986, USFS requested that the Fitzgeralds apply for a special use permit for their use of FDR 56B. The Fitzgeralds applied as requested but would not sign the Special Use Permit the USFS prepared. USFS then closed FDR 56B to all motorized vehicles effective June 1, 1988. The Fitzgeralds administratively appealed the road closure order to the Regional Forester. USFS suggested a private road easement in lieu of a permit and prepared an easement acceptable to USFS, but it was not acceptable to the Fitzgeralds because it was revokable and required payment of an annual fee. Id. at 1205 n.6. Following a

**[*75]** further appeal to the Chief of the Forest Service, FDR 56B was closed in December 1993. Id. at 1199.

Having exhausted their administrative remedies, the Fitzgeralds sued in the U.S. District Court for Arizona. Both parties agreed the Fitzgeralds had a right of access to their inholding ranch over USFS land. See Adams v. United States, 3 F.3d 1254, 1257 (9th Cir. 1993). The dispute was over the type and extent of that access and whether it could be restricted or regulated by USFS. The answer to that question revolved primarily around: (1) the Property Clause of the Constitution, U.S. Const. art. IV sec. 3, cl. 2, giving Congress plenary power to regulate the use of Federal land, see United States v. Gardner, 107 F.3d 1314, 1318 (9th Cir. 1997) (noting "the power over the public land thus entrusted to Congress is without limitations"); (2) the Alaska National Interest Land Conservation Act (ANILCA) enacted in 1980 which at 16 U.S.C. sec. 3210 provides that it applies to all National Forest Systems land, Mont. Wilderness Ass'n v. USFS, 655 F.2d 951, 957 (9th Cir. 1981); and (3) the 1976 Federal Land Policy Management Act, 43 U.S.C. secs. 1701-1785 (FLPMA). ANILCA provides USFS with the right to regulate access by those owning property who have no deeded easement but rely on access over USFS land to reach their

**[*76]** property.  Fitzgerald Living Trust, 460 F.3d at 1262 n. 5; see also 36 C.F.R. sec. 251.112(a), 110(c), 114(f) (2006).

After considering these factors and the Fitzgeralds' claims to a preexisting easement, the Court of Appeals for the Ninth Circuit rejected the Fitzgeralds' claims.   That court concluded that "FLPMA vests the Secretary of Agriculture with the authority to regulate access over the Sitgreaves National Forest.  43 U.S.C. sec. 1761(a).  The FLPMA easement offered to the Fitzgeralds, who hold no common law easements over the forest service land, is a reasonable exercise of that authority."  Fitzgerald Living Trust, 460 F.3d at 1268.

### d.     Lessons Learned

The state of the law and the current USFS policies on the use of USFS land for access to surrounded private property, expressed here and in the other two cases, are emblematic of current risks property owners must accept and deal with if they lack a deeded easement and must cross USFS property to reach their land.

The court decisions in McFarland and Fitzgerald were not yet issued when Shirley died on October 8, 2001, when Mr. Harrison appraised High Meadows in his December 11, 2002, valuation report, or when the sale of High Meadows closed On January 31, 2003.  But the law on which these cases was based was in effect, as were the changes in USFS policies on use and access to inholdings

**[\*77]** which precipitated these cases. The outcome of the cases was foreseeable and was presaged by decisions in Superior Oil Co. v. United States, 353 F.2d 34, 37 n.4 (9th Cir. 1965), and Mackie, 194 F. Supp. at 308, which preceded Shirley's death. See also Hoffenberg v. United States, 2010 WL 3083533 (D. Ariz. 2010); Skranak v. Castenada, 425 F.3d 1213 (9th Cir. 2005); McMaster v. United States, 2011 WL 3882475 (E.D. Cal. 2011), appeal docketed, No. 11-17489 (9th Cir. Oct. 17, 2011).

Given the proposed "trophy residence(s)" and its or their probable usage, the very high altitude of High Meadows, the available home site(s), the rugged terrain, and the substantial period of each year that High Meadows is snow covered, motorized vehicle access would be very important. Large homes need lots of supplies, particularly in cold, snowy weather. A trophy home on High Meadows would require not only an access easement for people and their supplies, but also for utilities, and an improved roadway for emergency services in accordance with local zoning and development codes.

**[\*78]**     3.     <u>Principal Issues Negatively Affecting High Meadows'
                        Value as of Both Relevant Valuation Dates</u>

As of both relevant valuation dates, High Meadows was burdened by TRPA
and Williamson Act restrictions and had other problems, that negatively affected its
value, which undoubtedly would have been considered thoroughly by a private
buyer before purchasing High Meadows. <u>See</u> <u>Flanders v. United States</u>, 347 F.
Supp. 95, 99 (N.D. Cal. 1972) ("There is little question that a Williamson Act
restriction artificially reduces the fair market value of the property for the period of
time it remains on the property."). High Meadows was surrounded on all sides by
USFS property. Consequently, access would have been a potential problem for
anyone seeking to build and use Mr. Harrison's "trophy residence" or any other
residence(s).[42] Road and utility easements had been neither sought nor granted.
TRPA had not rendered land coverage determinations. Water rights had not been
adjudicated. An IPES score had not been assigned. There was a contaminated site
that needed to be remedied. In valuing 1,789.33 acres of High Meadows at

[42]Anyone entering High Meadows was required to first cross at least six-tenths of a mile of USFS property. As is illustrated by a recent opinions of the Court of Appeals for the Ninth Circuit, discussed further <u>supra</u> and <u>infra</u>, the right to access one's property across Federal land can be an extremely uncertain one. <u>See</u> <u>McFarland v. Kempthorne</u>, 545 F.3d 1106, 1110 (9th Cir. 2008) ("McFarland has no valid claim to an easement. To the extent he has a right to access his property across federal land, that right is subject to the reasonable regulation of the Park Service, implemented through the permitting process.").

[*79] $29,500,000 as of September 12, 2002, Mr. Harrison assumed ideal conditions, including that the sale transaction would include reciprocal rights "to a 55' wide easement for access and utilities", but that was clearly not assured and actual conditions were far from ideal.[43]

Although some of the aforementioned issues were resolved by the time the sale to ALC closed in January 2003, they certainly would have had a negative effect on the price that a hypothetical willing buyer, including one seeking to build a single "trophy home", would have paid on either relevant valuation date.[44]

---

[43]Under the rubric of "extraordinary assumptions", Mr. Smith did the same.

[44]It is uncertain whether a hypothetical private buyer seeking to build a "trophy house" would have been able to resolve those issues and, if so, whether such a buyer would have been able to resolve them as expeditiously as the Giovacchinis, ALC, and USFS were able to. For example, had a private buyer seeking to build a "trophy house" purchased all of High Meadows, it is unclear whether (and, if so, under what terms) USFS would have granted such a buyer the easements necessary to adequately access the house and supply it with utilities.

Ms. Morefield testified that USFS sent a memo to TRPA in an effort to put USFS' weight behind the Giovacchinis' request for land coverage determinations. A private purchaser of High Meadows frustrating USFS' efforts to acquire the property and obtain control of the prized critical watershed land might not have enjoyed that benefit. See McFarland, 545 F.3d at 1111 (holding that access across USFS property to landlocked parcel by nonmotorized transportation such as snowshoe, horse, cross-country skis, or sled dogs, in winter months, constituted access to property no matter how inconvenient); Fitzgerald Living Trust v. United States, 460 F.3d 1259, 1261-1262 (9th Cir. 2006); Skranak v. Castenada, 425 F.3d 1213, 1219-1220 (9th Cir. 2005); Adams v. United States, 3 F.3d 1254, 1260 (9th

(continued...)

[*80] Someone seeking to purchase a single homesite would have likely been very reluctant to pay $29,500,000 considering the aforementioned issues. We also agree with the estate and its expert, Mr. Johnson, that valuing a single homesite on a land coverage, or even on a per-acre, basis led Mr. Harrison to significantly inflate the value of High Meadows. Moreover, a hypothetical willing buyer looking to build a "trophy house" on High Meadows would have recognized that the Lake Tahoe Basin is a heavily regulated environment and that the trend in that area is toward more--not less--regulation.[45] Such a buyer would certainly have desired assurances that regulatory impediments would not delay, prevent or unduly burden the construction and use of such a home. Absent such legally enforceable assurances, a prospective purchaser would most likely have been willing to pay far

---

[44](...continued)
Cir. 1993).

[45]This trend, evident as a historical matter, is further confirmed by the 2003 California legislation imposing new restrictions on Williamson Act properties. That legislation, Cal. Gov't Code sec. 51250, provides a penalty applicable to structures exceeding 2,500 sq. ft., constructed on Williamson Act land in violation of the contract provisions.

**[*81]** less than Mr. Harrison thought.[46]  ALC and USFS had no such concerns and

---

[46]We recognize that the Williamson Act limitations and restrictions could have been addressed on a prospective basis by giving notice of termination on or before the next anniversary date.  Then after a 10-year period had lapsed, they would no longer apply.  The Court does not believe this option has a material effect on High Meadows' value as of June 17, 2000, or October 8, 2001.  At the time of the gift and at Shirley's death, the prime interest rate, according to the Wall Street Journal, with respect to which the Court will take judicial notice was, on May 17, 2000, 9.50% and on October 3, 2001, 5.50%.  Even at the lower 5.50% rate, a dollar discounted at 5.50% is significantly reduced in 10 years.  A dollar, discounted at a compounded annually 5.50% interest rate would be worth only $.585431, or about $.59 today, if payable in 10 years.  The evidence does not reflect that the increase in High Meadows' value, if High Meadows were freed from the Williamson Act restrictions, on June 27, 2010, or October 8, 2011, would materially exceed, if it exceeded it at all, this time value of money discount.

Further, a 10-year delay in the ability to acquire required governmental approvals for development and required permits, under High Meadows' El Dorado County AE zoning classification, would considerably increase the prospective purchaser's risk of further development obstacles.  The risk would be even higher given the then-current environmental sensitive antidevelopment trends as to this unique, pollution-sensitive basin.  That, in turn, would likely further decrease the fair market value of High Meadows.  The Court concludes, and the parties seem to mostly agree, that waiting out the Williamson Act contract was not, except perhaps for the 566 retained acres, a significant viable choice in valuing High Meadows.  Early cancellation of the Williamson Act contract was also a theoretical alternative.  But there would be a significant financial cost, of approximately 12% of High Meadows' value, to make up for the previously reduced property taxes.  There is also significant uncertainty whether the necessary governmental jurisdictions, including the El Dorado County Board of Supervisors, would vote to approve cancellation.  These factors render this option too speculative to meaningfully affect the value of High Meadows.  A new owner could also request a rezoning of High Meadows to Timberland Preserve (TPZ) and, if it were rezoned, could also request cancellation of the Williamson Act contract without payment of the 12.5% fee.

(continued...)

**[\*82]** despite assertions, in court, to the contrary, did not properly scrutinize Mr. Harrison's December 11, 2002, value conclusion to account for them. To the contrary, they, at least in part, dictated, abetted, and facilitated such assumptions.

The fact that Mr. Harrison noted Mr. Merrill's offer to enter into an option agreement and incorrectly characterized that offer as "an expired offer to purchase" raises serious questions. The Court is left to speculate whether he allowed that offer, which we have already deemed immaterial, to influence his judgment as to High Meadows' value. See supra note 8.

Finally, it is disconcerting that Mr. Harrison raised the fair market value of 1,789.33 acres of High Meadows to $29,500,000 as of September 12, 2002, a date approximately 1 year after Shirley's death, from $25 million as of October 10, 2001, only 2 days after her death, despite Mr. Clark's intervening report which was critical of Mr. Harrison's first report.[47] Even more disconcerting is that, in

---

[46](...continued)
However, TPZ zoning is extremely restrictive and would permit only a mobile home or caretaker single family residence on High Meadows. See Cal. Gov. Code sec. 51282.5; El Dorado County Code sec. 17.44.050.

[47]Mr. Harrison apparently saw Mr. Clark's criticism (or was at least provided with information as to some of Mr. Clark's concerns) because, in his subsequent work product, he eliminated the two comparable sales that Mr. Clark had criticized. This problem is aggravated by the first amendment to the High Meadows sales contract. At the time the amendment was made, June 20, 2002, Mr. Harrison had

(continued...)

[*83] their zeal to acquire High Meadows, USFS appraisers turned a blind eye to that sequence of events in swiftly approving Mr. Harrison's December 11, 2002, valuation report.[48]  Ms. Moore, Ms. Brower, and Ms. Morefield testified that it is USFS policy not to consider unsolicited appraisals.  That policy coupled with USFS' desire to acquire High Meadows led USFS to pay $29,500,000 in order to acquire 1,789.33 acres of High Meadows.[49]  As discussed, this Court, while it may

_____

[47](...continued)
already prepared and issued to ALC his November 29, 2001, valuation report, valuing High Meadows on October 10, 2001, at $25,000,000.  The amendment seems to put the cart before the horse by prescribing an "Approved FMV" of not less than $26,000,000.  Sure enough, Mr. Harrison's next appraisal report, as of September 12, 2002, more than met that provision by valuing High Meadows at $29,500,000.

[48]In a similar vein, to ensure that High Meadows would ultimately end up in the hands of a conservation-minded agency, ALC and Mr. Etchegoyhen (ALC's point man for the acquisition of High Meadows and a longtime acquaintance of J.B. and Ms. Lekumberry) bent over backwards to get the deal done.  In Mr. Etchegoyhen's own words:  "We did some things that I suspect aren't traditional for land conservation organizations."  Those "things" included borrowing money on ALC's line of credit in order to pay new consideration to resurrect the deal, paying for the environmental remediation, and agreeing to "pay the points and the interest of whatever it may be for the family to borrow a significant sum of money to enable them to re-sign with us and pay whatever things they needed to get paid."  Mr Etchegoyen took the lead on those issues.

[49]They did not look at Mr. Harrison's November 29, 2001, report.  They reviewed only Mr. Harrison's December 11, 2002, report.  Had they seen Mr. Harrison's first report and Mr. Clark's review of that report, they might have (and notwithstanding USFS policy on appraisals should have, in determining the

(continued...)

**[\*84]** carefully consider a valuation determination arrived at by another Federal office or agency, is not bound by that other office's or agency's determination. <u>See Pasqualini v. Commissioner</u>, T.C. Memo. 1994-323.

The fact that one arm of the Federal Government may have overpaid for 1,789.33 acres of High Meadows does not mean that another arm of the Federal Government should, absent statutory authorization, require the estate to regurgitate its questionable gain by overpaying estate and gift tax so that the Treasury may recoup at least a portion of that money.

We previously concluded the sale of High Meadows to ALC is the most meaningful and comparable sale and as such serves as the initial jumping-off point for our penultimate value analysis. Unfortunately, this sale was not the result of a normal free market, arm's-length transaction but resulted from a contrived, even if well-meaning, effort to assure the conveyance of critical, mostly pristine, high elevation watershed property to USFS. In that effort, unlike most private transactions, price was not, for USFS, always the most important consideration. Price was driven by the estate's desire to maximize its financial situation in order to pay imminent Federal estate taxes. The estate hoped to achieve significant

---

[49](...continued)
credibility and procedural regularity) expressed concern regarding Mr. Harrison's ultimate conclusion as to High Meadows' value.

[*85] family liquidity and ensure realization and perpetuation of a significant family estate, amassed by three generations and hard work, while protecting High Meadows in its historic state.

The High Meadows sale price was based on Mr. Harrison's appraised value. In defense of that $29,500,000 value, respondent chose not to call the one person who set the price, Mr. Harrison, but instead called as his appraisal expert Mr. Smith. Mr. Smith valued High Meadows, including the approximately 500 acres not sold to ALC, at $25,185,000 on June 27, 2000, and valued the approximately 500 (actually 566.77 acres) retained acres as of October 8, 2001, at $6,780,000.

In both instances extraordinary assumptions were made at the direction of respondent equivalent to those made by Mr. Harrison on the instructions of ALC and USFS. Mr. Smith further acknowledged, on cross-examination, that his valuation was dependent on his regression analysis and that without it, he could not have valued High Meadows. He also admitted that his linear regression analysis would statistically result in a conclusion within an acceptable range of error only 36% of the time; this appraisal and Mr. Smith's direct opinion testimony as to value are thus of little, if any, use and fail our gatekeeper

**[\*86]** test.[50]   The estate previously objected to this testimony.  We allowed it during and immediately following the trial.  The Court has since concluded it is of no assistance to the Court, because of its credibility and methodology problems, and has disregarded its ultimate valuation conclusions in reaching our valuation determinations.

### C.    Need for Valuation Adjustments

The Court concludes significant price adjustments must be made to Mr. Johnson's valuation report.  Foremost of concern is his failure to use any comparables in the Lake Tahoe Basin and, in the Court's view, to properly adjust values for that omission.  Mr. Johnson's extraordinary assumptions, implicit in his appraisal, are also of significant concern, such as his conclusion that construction of a "trophy home" was not permitted by the Williamson Act.

After careful consideration of the record as a whole, the Court will begin its work at a preliminary value of $29,500,000 for 1,790 acres of High Meadows.  This is the value originally arrived at by Mr. Harrison, as of September 12, 2002, which established the purchase price paid by ALC for High Meadows in January

---

[50]See generally Barabin v. Asten-Johnson, Inc., 700 F.3d 428, 431 (9th Cir. 2012); Esgar Corp. v. Commissioner, T.C. Memo. 2012-35, slip op. at 30-32 (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 551 (1993), Federal Rules of Evidence 702 and 703, and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1949)), appeal filed (10th Cir. Sept. 6, 2012).

[*87] 2003. This as-of appraisal valuation date is approximately eleven months after the date of Shirley's death. Mr. Harrison valued the same property as of October 10, 2001, two days after Shirley's death and before the first amendment of the sale agreement with ALC assuring at least a $26 million value.[51] This prior value was arrived at by Mr. Harrison before, in the Court's opinion, he became an advocate for the estate, in an effort to obtain an unrealistically high sale price for High Meadows.

The Court, on the basis of the factual record in its entirety and its own valuation analysis, will adjust the $29,500,000 purchase price, as established by the sales agreement. First, that price requires correction to October 8, 2001, and adjustment for the delayed appraisal valuation date of September 12, 2002, which becomes meaningful only on January 31, 2003, when the sale actually occurs. Second is the apparent assumption of access, based on the proposed reciprocal access right to be contained in the conveyance of title. This assumption relied on

---

[51]Mr. Harrison's November 29, 2001, appraisal report which had arrived at a $25 million value was admitted into evidence only on a limited basis by stipulation of the parties. That stipulation limited the admission of Exhibit 56-J "to the extent that the petitioners [sic] are going to utilize that document to cross-examine the Forest Service personnel to ascertain or attempt to ascertain or explore the extent to which Mr. Harrison followed the Yellow Book in his appraisal and what he did in his appraisal".

[*88] discussions with Mr. Bob Rodman, a USFS employee,[52] under the heading "Limiting Condition Access". Third is the fact that the comparables, while located within the Lake Tahoe Basin, were not of comparable size. Fourth is the valuation of High Meadows by size rather than development rights. Fifth are the other miscellaneous condition matters mentioned previously.[53]

D.    Court's High Meadows Sale Price Adjustments

1.    Rising Prices Valuation Correction Date Adjustments

We begin with the $29,500,000 sales price for 1,789.33 acres of High Meadows, which includes High Meadows' one currently existing development

---

[52]Mr. Harrison also alludes to "The Alaska National Interest Land Conservation Act and 16 U.S.C.A. § 3210(a) [which he implies] provides that the federal government must provide reasonable access to allow the reasonable use and enjoyment of the land serviced." Missing from his analysis is a consideration of what "reasonable access" in this context means and how that may affect the value of High Meadows.

[53]A number of factors were considered that affect High Meadows' value, but were not fully and appropriately weighed in Mr. Harrison's December 11, 2001, appraisal report. These included: no official determination of land coverage or capability was made, a small portion was contaminated, and no official IPES score existed. The cumulative effect of these problems is de minimis when compared with the factors specifically discussed infra.

[*89] right.[54]  Initially, we adjust this value to correct for inflation,[55] the time value

of money, and increases in market prices from the relevant June 20, 2000, and

October 8, 2001, valuation dates to the ALC-USFS sale date of January 31, 2003.

A preponderance of the evidence indicates that prices for Lake Tahoe Basin real

property were (except for a few months following the September 11, 2001, terrorist

attack) rising during this period.  Mr. Harrison's value for the same 1,790 acres of

High Meadows increased from $25,000,000, as of October 10, 2001, to

$29,500,000 as of September 12, 2002.  The difference is not explained and we are

left to ponder whether it is due to the valuation dates, a change in his opinion,

client pressures, a change in facts, or all of the above.  He does note in the

October 10, 2001, appraisal that "Annual appreciation of value has been

substantial in lakefront properties, lake view properties, and large residential estate

properties."  In the same vein, the September 12, 2002, appraisal states:  "Over

---

[54]The appraisal on which the sale price was determined was as of September 12, 2002, but the original sales agreement was, at best, in a state of hiatus, as of January 3, 2003, until the January 13, 2003, fourth amendment was executed and when USFS received funding to permit the sale.  The sale itself did not occur until January 14, 2003, as to equitable title and January 31, 2003, as to legal title.  These facts indicate a January 31, 2003, not a September 12, 2002, valuation date.

[55]The January 2000, All Urban Consumers U.S. Bureau of Labor Statistics inflation rate using 1982-1984 = 100, of which we shall take judicial notice, stood at 172.4.  As of October 2001, it was 177.7, and in January 2003, it was 181.7.

[*90] recent years, real estate values have generally increased for both residential and income producing properties." The estate's expert Mr. Johnson, in his July 29, 2002, appraisal report indicates that

> Residential property values have increased significantly. This is particularly true for lakefront properties or properties with views of Lake Tahoe. The national recession and the tragic events of September 11, 2001 did cool the local economy through the winter.[56] However, property values have continued to increase during the spring and summer of 2002. * * * [Emphasis added.]

Respondent's expert, Mr. Smith, concluded in his September 3, 2002, appraisal report on the value of 2,289.33 acres as of June 2, 2000, that "The last twenty years has seen surge in residential development which has accelerated land values on residential and commercial properties." He further opines in his September 13, 2002, appraisal report on the approximately 500 High Meadows acres not sold to ALC-USFS that "Adding to the limited amount of private land is the highly regulated environment and subdivision moratorium that curtails development on a large portion of the existing private lands. This results in a scarcity situation which has resulted in significant increases in land values for developable properties."

---

[56] This conclusion also found some support, with a slightly different time period, from Mr. Clark, who, to the question from petitioner's counsel "The market had pretty much tanked in 2000?" answered "That was my opinion."

[*91] To reflect the rising prices, Mr. Harrison uses a 10% per year appreciation rate.[57] Mr. Smith, looked at appreciation of Lake Tahoe Basin properties (in essentially the same physical condition at all times, ordinary wear and tear excepted) which sold more than once during the period January 6, 1997, to October 7, 2005. From this study he concluded real property prices rose from January 6, 1997, to August 9, 2002, at an average appreciation rate of .606% per month, and from August 9, 2002, to October 7, 2005, at an average rate of .7605% per month. Mr. Johnson also adjusted for appreciation during this period, but was less specific as to his amounts.

The Court concludes that the $29,500,000 sale price should be adjusted down by 9% to the October 8, 2001, date of Shirley's death, and by 17% to the June 27, 2000, HM6 sale date to adjust for the roughly 16-month and 31-month

---

[57] In his December 11, 2002, appraisal, Mr. Harrison states:

> I have discussed the change in value due to time with many brokers and appraisers within the Lake Tahoe Basin. Real Estate Brokers are generally of the opinion that lakefront properties have increased fifteen to twenty percent per year over the past five years. In reference to residential estate properties with a view, this estimate ranges from ten percent to fifteen percent per year. In my opinion, the comparable sales data should be adjusted at an overall rate of ten percent per year.

**[\*92]** periods between the January 31, 2003, sale and Shirley's death, and the HM6 sale, respectively.

### 2. Adjustment for Uncertainty of Access

There were critical legal access difficulties with respect to High Meadows' ingress, egress, and utilities on both June 27, 2000, and October 8, 2001. By arbitrary fiat the appraiser, whose determination of fair market value established the $29,500,000 January 31, 2002, sale price, was instructed to ignore this fact, thereby triggering the so-called GIGO Rule, garbage in-garbage out. As all ALC and USFS appraisals assumed sufficient access for the intended residential use, accompanying utility easements and building/zoning code emergency (police, fire, health, etc.) access, the task is left to the Court to determine the applicable price adjustment needed to correct this glaring deficiency. The evidentiary record is of little help, other than its confirmation that the needed access did not exist on June 27, 2000, or October 8, 2001. Without each of these issues being resolved, no residential or commercial development was permitted.[58]

---

[58]Mr. Clark confirmed the obvious that convenient year-round access was necessary for a "trophy residence". He stated:

> From the buyer's perspective, he's going to be concerned what limitations there are, if any, on access to the property. In other words, you can have access to the property by foot, but if you're going to

(continued...)

[*93] If respondent's $36,280,000 value for all of High Meadows and its single development right on the October 8, 2001, date of Shirley's death was correct, then the single trophy residence land cost alone would run from $29,500,000 to $36,280,000, depending upon how much land was purchased. Improvement costs, including road, utilities, environmental remediation, and site preparation, and residential structure and associated structural improvements would be extra. Total investment would likely run from $35 to $55 million for a home which, because of winter conditions, might not be occupiable for two to four months per year.

---

[58](...continued)
develop the property with a major McMansion, you've got to have a public roadway, you have to have a roadway sufficient for large trucks and other equipment to come in and do the work. * * * You know, any time you're dealing with easements of any sort, but particularly access easements, it's pretty critical to know what the rights of the so-called dominant tenement really are. * * * Very critical.

When cross-examined about access, he was asked: "In an assignment such as this, is it typical for the person hiring the appraiser to give the appraiser certain assumptions he can work with?" In response, Mr. Clark answered: "Not unusual. But--but the assumptions can't be so onerous as to distort the value of the property."

Mr. Johnson testified that it was important to know whether there was legal access and that there was none to High Meadows. Where, as here, legal access was assumed, he stated: "If they're appraising the property in an as-is condition as it existed on a certain date, they should address any risk associated with the legal access."

**[\*94]**  That investment would be at considerable risk if only inconvenient nonmotorized physical access could be obtained and residential improvements, as intended, would be impossible without utilities and governmental emergency vehicle access.  This risk factor is hard to quantify, but a price discount of 20% to 50% is indicated for what is evidently a pattern of USFS policy and Federal court cases which establish availability of convenient utilities and year-round motorized access over USFS land as a significant risk.[59]  However, on October 8, 2001, not all of the previously discussed access cases had yet been resolved and some were

---

[59]If convenient access were not obtained, a purchaser would be left with a "white elephant" unsuitable for development for at least 10 or more years and usable in the meantime for only its historic commercial uses, cattle grazing, timber harvesting, and growing Christmas trees.  Absent that, a purchaser who was unwilling to work the land or felt contracting the work out inconvenient could be left with property taxes and furnishing to the public a no-cost conservation easement and scenic view (i.e., "Big hat no cattle").  We reach the discount by consideration of all the evidence in the record.  That our determination is appropriate receives some support from Ga. Power Co. v. 138.30 Acres of Land, 596 F.2d 644, 650 (5th Cir. 1979), vacated and remanded on rehearing en banc on another issue sub. nom. Ga. Power Co. v. Sanders, 617 F.2d 1112 (5th Cir. 1980), where, in the discussion of an appropriate access discount,  the appraisers, noting the qualified easement access, opined that a 20% to 25% discount to "account for the limited nature of the easement" was appropriate.  See also Bank One v.  Steffens (In re Steffens), 275 B.R. 570, 575 (D. Colo. 2002) (noting uncontroverted testimony that a foreclosure on two parcels of property would leave a third parcel without access, thus its value "will decrease significantly (perhaps by as much as 50%) if Bank One is allowed to complete its judicial foreclosures on Parcels 1 and 2.  This decrease in value springs directly from Parcel 3's 'landlocked' location.").

[*95] in active litigation with the possibility of an owner-favorable result. Consequently, we shall use the lower number in this range and reduce the $29,500,000 sale price by 20% to reflect the generally unfavorable, but still unsettled, legal status of the existing historic access over USFS land on June 27, 2000, and October 8, 2001.

### 3. Parcel Size Adjustment

All of the appraisers concurred that the value per acre is significantly affected by the purchase parcel size. Generally, the appraisers agreed that the per-acre price for small parcels is higher to considerably higher for small parcels. With respect to his first appraisal, Mr. Harrison notes that "Sale seven is the only comparable sale [he considered] that has comparable size to the subject [High Meadows] property." It was in the end disregarded because it was "substantially far inferior to the subject [High Meadows] site and is located outside of the Lake Tahoe Basin. * * * All of the sales data indicators, in * * * [Mr. Harrison's] opinion, would have to be reduced substantially to indicate a fair market value for the subject property on an acreage basis." Mr. Harrison declined to adjust for size on a per-acre basis because he believed it "would be extremely subjective and would not * * * produce an indicator of value that would be reliable." Instead, he

**[\*96]** elected to value High Meadows by a determination of High Meadows'

"Market Value by Coverage".

At the end of his December 11, 2002, appraisal report, under the heading

"Test of Reasonableness", Mr. Harrison states: "It would be anticipated that the

average market value per acre for the subject property in comparison to all of the

sales data would be lower than each of the comparable sales as a result of the size

relationship of the subject to the sales data."

Mr. Smith's appraisal report under the title "SUMMARY AND

CONCLUSION OF VALUE" states:

> All of the sales required downward adjustment to the subject.
> Sale No. 25 ($13,022/Acre) was a 1,789.33-acre parcel that was a
> portion of the subject. This sale was identical to the subject in all
> regards except for its smaller size. * * * To develop an opinion of
> value for the subject, considering its larger size, a regression analysis
> will be employed to forecast a value based on the comparable sales.

The Court is convinced that the size of a parcel and its relative price per acre

are closely related. Smaller otherwise comparable parcels each with their own

development right(s) sell for considerably higher prices per-acre than larger

otherwise comparable parcels as Mr. Harrison and Mr. Smith noted. This is

consistent with this Court's general conclusion with respect to real estate values.

See Akers v. Commissioner, 799 F.2d 243, 246 (6th Cir. 1986) (agreeing with this

[*97] Court that the closer in size a property is, the more comparable it is), aff'g

T.C. Memo. 1984-490; Estate of Kolczynski v. Commissioner, T.C. Memo. 2005-

217 (noting premium paid for smaller parcels); Pope & Talbot, Inc. & Subs. v.

Commissioner, T.C. Memo. 1997-116 (concluding the larger the parcel the higher

the appropriate discount and countenancing a 39% discount for size over a lower

21.6% discount urged by respondent), aff'd, 162 F.3d 1236 (9th Cir. 1999). In this

instance the Court concludes that the efforts by Mr. Harrison and Mr. Smith to

adjust for size were inadequate. Because of the appraisal assumptions including

access their appraisal reports were materially inaccurate.

Mr. Johnson determined this problem was so significant that he eschewed all

Lake Tahoe Basin sales, none of which involved enough acres to be comparable, for

much larger parcels in surrounding areas, primarily the Nevada eastern slope of the

Sierra Nevada Carson Range.

Mr. Smith recognized that the disparate parcel size differential was so

significant that its effect on value would require a material adjustment. He

addressed the adjustment with his statistically flawed regression analysis and

[*98] acknowledged that without it, he could not value High Meadows other than to opine that the value ceiling would be no more than $13,022 per acre.[60]

In his as of October 10, 2001, appraisal, rather than confront the disparity in acreage between his 9 comparables and High Meadows, Mr. Harrison sought to circumvent this issue by valuing High Meadows on the basis of usable developable square feet of "coverage" in lieu of a price-per-acre comparison.[61]

---

[60]See supra note 37.

[61]Mr. Harrison, in his as of October 10, 2001, High Meadows appraisal, explains that

> Analyzing the subject property on a basis of overall market value per acre is extremely complicated because the subject property has 935,206 square feet of sensitive level coverage. This results in a non-sensitive land coverage of 535,609 square feet. * * *

> All of the [comparables] sales data indicators, in my opinion, would have to be reduced substantially to indicate a fair market value for the subject property on an acreage basis. Any adjustments to the sales data, on an acreage basis, would be extremely subjective and would not, in my opinion, produce an indicator of value that would be reliable. Therefore, estimating the market value of the subject property by the application of an overall value per acre simply is not possible.

Coverage refers to usable developable land under the TRPA regional plan for land use within the Lake Tahoe Basin. In this context it is, in significant part, determined by the IPES score assigned to the property at issue. At the relevant valuation dates, there was no IPES score officially assigned to High Meadows. Therefore, Mr. Harrison relied upon a land coverage and estimate analysis made by

(continued...)

[*99] This approach actually ended up specifically addressing and valuing

1,470,815 high-capacity, presumably developable, square feet of the total

77,972,400 square feet (i.e., 1,790 x 43,560 sq. ft. per acre) comprising the High

Meadows sale to ALC-USFS.  Even at that much lower number it ignored the fact

that there was far more coverage than required for even the largest reasonably

conceivable "trophy residence".  It valued High Meadows against his selected

comparables, all of which were dramatically smaller, using a price per square foot of

coverage.   His value of $50 per square foot x 535,609 square feet of nonsensitive

coverage produced a value rounded to the nearest million of $27,000,000.  After

adjusting for cost of a road and utilities and adding in $872,000 for timber, he

arrives at his rounded $25,000,000 appraised value.

For his as of September 12, 2002, appraisal, Mr. Harrison used a somewhat

similar approach.  But instead of valuation per square foot, he used seven

comparable sales selected inter alia on their square feet of coverage, and then, on

the basis of those seven comparables, arrived at a value of $125,000 per acre for

[61](...continued)
Basin Strategies, a land consulting firm he believes was conversant with and familiar with TRPA land coverage rules and regulations.  TRPA classifies soils (i.e., land surface) into seven categories.  Categories 1, 2, and 3 are so erosion and drainage sensitive that no physical improvements are allowed.  Categories 4, 5, 6, and 7 are considered to be higher capability land where physical improvements, based upon land coverage ratios ranging from 20% to 30%, are permitted.

[*100] the high-capability land. Mr. Harrison then concluded High Meadows contained, in the aggregate, 238 acres (within the 1,471 acres of so-called parcel 6 of high-capability land because of its aggregate IPES scored classes 4, 5, 6, and 7 land). In High Meadows' case, the 238 acres came from classes 4 and 6 land permitting 2,169,288 square feet of developable coverage. He then valued the 238 acres at $29,750,000 (i.e., 238 x $125,000 = $29,750,000), added in $1,396,200 for the other 1,551.33 acres and subtracted $1,710,000 for access and utility costs to get $29,436,200, which he rounded to the $29,500,000 value at September 12, 2002.[62]

He based his enlarged amount of high-capacity coverage land on a TRPA survey that had apparently been conducted since his as of October 10, 2001, appraisal, that had relied on the Basin Strategies coverage estimate. While this

---

[62] Mr. Harrison also noted 159,430 square feet and 236,365 square feet of coverage on parcels 4 and 5; but because these parcels "lie at the easterly edge of the subject property and would be difficult to improve, due to the cost of utilities and a paved access", he largely disregarded this coverage. The coverage and its related acres are lumped together as a part of the 1,551.33 acres comprising the balance of High Meadows. These acres he valued at $900 per acre, or a total of $1,396,000.

Mr. Johnson in his critique of the USFS purchase indicates TRPA-approved coverage of 4,641,006 square feet, whereas Mr. Harrison used 3,102,125 (i.e., 2,169,288 + 159,430 + 236,313 = 3,102,125). The difference is not clearly explained by the record but may relate to the coverage on the 588 retained acres not sold to ALC-USFS.

[*101] change in facts helps in explaining his change in value from $25,000,000 to $29,500,000 between the two appraisals, it, and his adjustments to the seven comparables, do not effectively address the parcel size problem.

The coverage approach improperly values High Meadows because it equates value with coverage even though the coverage is, as a practical matter, superfluous, so long as the Williamson Act applies to the property.  As previously noted, absent government approval and payment of the 12-1/2% cancellation charge, Williamson Act termination would require at least 10 years.[63]  We have already concluded cancellation is extremely unlikely.  Consequently, when coupled with the time value of money, excess high capacity coverage has only a de minimis effect on value.

Using the updated coverage figures, Mr. Johnson, in his critique of the USFS purchase, concludes that even after allocating 250,000 square feet to access road and home site(s), there would be 2,852,125 square feet of excess coverage.[64]

---

[63] Any additional development, if allowed by TRPA would, according to respondent's expert, Mr. Smith, also require purchase of a development right, which he indicates cost around $1,000 from 1999 through 2002, and at least one  unit of use which, during this time, he indicates sold for about $10,000 per unit.

[64] Mr. Johnson assumes existing coverage located on the USFS Upper Truckee parcel would be sufficient to develop the paved road across that parcel.  He notes that even the largest estates built to date in the Lake Tahoe Basin required less

(continued...)

[*102] Excess coverage can only be transferred to others who are in the same one of the nine watersheds (hydrologic areas) that the coverage comes from, in this case the Upper Truckee River Watershed in California, not watersheds in Nevada where demand was greater.

In his review appraisal Mr. Clark, who was using the earlier lower coverage numbers from the Basin Strategies estimate, noted that

> Considering the coverage available through the California Tahoe Conservancy Soil Bank of some 330,000 square feet at a price of $5 per square foot there would appear to be little demand for an additional 535,609 square feet of coverage. * * * Over an eleven-year period, the California Tahoe Conservancy has been able to market only 83,000 square feet of coverage.[65]

> Under any circumstance the coverage available on the subject property is so large and excessive for development of the subject

---

[64](...continued)
than 250,000 square feet of coverage, which, he concludes, could be provided by only 19.13 acres of high-capability land. The Court generally agrees with that conclusion.

[65]Mr. Johnson indicates that over the last 16 years California Tahoe Conservancy, which claims to have cornered 90% of the coverage market, sold 332,000 square feet of coverage in the Upper Truckee Hydrological Area, an average of 20,750 square feet per year. Even assuming an absorption rate of 30,000 square feet per year, he calculates it would take 88 years to dispose of the excess coverage. We note Mr. Smith recognized an additional 538,880 square feet of coverage in his September 14, 2007, report which he assigns to the 566-acre retained piece of High Meadows not considered by Mr. Harrison, who appraised only the separate 1,790 acres.

[*103] property and the demand for coverage on other parcels is so limited that there can only be a minimal value for sensitive soil coverage.

The superficial measures and adjustments using Lake Tahoe Basin comparables, based on coverage, were inadequate because they fail to integrate coverage with development rights. One without the other is, as a practical matter, meaningless. We conclude a further 11% discount to the value as of October 8, 2001, and the value as of June 27, 2000, is appropriate to resolve this deficiency and the other small items previously identified.

### 4. Application of the Adjustments

Applying these three discount adjustments, which total 40% (i.e., 9% + 20% + 11% = 40%) as of October 8, 2001, to the $29,500,000 sale amount, indicates a value for 1,790 acres and the one development right of $17,700,000 as of October 8, 2001. The three discount adjustments total 48% as of June 27, 2000. Applying this to the $29,500,000 results in a value of $15,340,000. To these figures must be added the value of the 566 acres not sold to ALC-USFS and excluded from the Harrison appraisal.

On a per-acre basis this amount would be, as to October 8, 2001, $5,596,760 (i.e., $17,700,000 x 566/1,790 = $5,596,760) and as of June 27, 2000, would be $4,850,525 (i.e., $15,340,000 x 566/1,790 = $4,850,525). However, a pro rata

[*104] analysis ignores differences in land coverage, terrain, view, accessibility, and development costs. Most importantly, it ignores the fact that the value of the one existing development right was included in the sale of the 1,790 acres.

The lazy L-shaped retained parcel was closer to the existing subdivision and its utilities. It enjoys flatter terrain, is overall at a lower average elevation and, like the 1,790 acres, had sufficient coverage for one or two possible future residences, as speculated by Mr. Smith, after a termination of the Williamson Act contract. That, however, would also require TRPA approval. Views are less dramatic from this parcel. To adjust for these factors, especially the lack of a development right and after considering the possibility of Mr. Smith's postulated two additional rights upon Williamson Act termination, most likely at least 10 years or more in the future, we will reduce the value of the 566 acres by a net 35%. This results in a value of $3,637,894 (i.e., $5,596,760 x 65% = $3,637,894) as of October 8, 2001, and $3,152,841 (i.e., $4,850,525 x 65% = $3,152,841) as of June 27, 2000. These parcel values result in a total value for High Meadows on October 8, 2001, of $21,337,894, and as of June 27, 2000, of $18,492,841.[66]

_____

[66]For October 8, 2001, $17,700,000 (the value of the 1,790 acres, $29,500,000, discounted by 40%) plus $3,637,894 (the value of the 566 acres, $5,596,760, discounted by 35%) equals $21,337,894.

(continued...)

[*105] E.    Valuation Determinations

We ultimately decide that Mr. Johnson dramatically underappraised High Meadows.  The January 2003 sale and Mr. Smith's two appraisal reports  were based on flawed findings and conclusions.  Mr. Harrison's similarly defective appraisal substantially overvalued 1,789.33 acres.  Mr. Smith also overvalued both the sold 1,790 acres and the retained 566 acres of High Meadows.  After reviewing and analyzing all relevant evidence in the record, and using our best judgment, the  Court concludes:  respondent, who has the burden of proof, has failed to establish that High Meadows, in its 2,356-acre entirety, was worth more than a rounded $21,300,000 as of October 8, 2001, and $18,500,000 as of June 27, 2000.[67]   Thus,

---

[66](...continued)
For June 27, 2000, $15,340,000 (the value of the 1,790 acres, $29,500,000, discounted by 48%) plus $3,152,841 (the value of the 566 acres, $4,850,525, discounted by 35%) equals $18,492,841.

[67]Concerning the estate tax, we accept that the value of the estate's interest in the merchantable timber on High Meadows is $453,117, as reported on the estate tax return.  That figure is based on a report prepared for Mr. Kuckenmeister in July 2002 by Mr. Steve Cannon, a registered professional forester.   Mr. Cannon valued High Meadows' merchantable timber at $1,294,620.  The $453,117 figure is arrived at by multiplying the value of the harvestable timber (after subtracting logging costs, timber harvest planning costs, fish and game fee, and three removable log stringer bridges needed for the harvest) by 50% to account for the fact that the estate had a 50% undivided interest in High Meadows on October 8, 2001.  The resulting figure, $647,310, is then multiplied by 70% to account for the 30% discount rate claimed in its tax return.   Likewise, the values for High Meadows which we have arrived at for
(continued...)

[*106] the value of High Meadows for estate tax purposes was $21,300,000 as of October 8, 2001, and the estate tax liability should be calculated using that figure as a starting point. The value of High Meadows for gift tax purposes was a rounded $18,500,000 as of June 27, 2000, and the gift tax liability should be calculated appropriately.

## VI.    Section 6662 Penalties

Under section 7491(c), respondent bears the burden of production with respect to the estate's liability for the section 6662(a) penalty. This means that respondent "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

Subsection (a) of section 6662 imposes an accuracy-related penalty on an underpayment of tax that is equal to 20% of any underpayment that is attributable to a list of causes in subsection (b). Among the causes justifying the imposition of the penalty are negligence or disregard of rules or regulations and any substantial

---

[67](...continued)
both the estate and gift tax (i.e., relevant dates October 8, 2001, and June 27, 2000, respectively) are for a sale of the entire property including marketable timber, but except for marketable timber as discussed above, do not consider any discounts for blockage, fractured ownership, etc. The parties have resolved the discount issue.

[*107] estate or gift tax valuation understatement.  Sec. 6662(b)(1), (5).  Section

6662(c) defines negligence as "any failure to make a reasonable attempt to comply

with the provisions of this title".  "[D]isregard" is defined to include "any careless,

reckless, or intentional disregard."  Id.  Under caselaw, "'Negligence is a lack of

due care or the failure to do what a reasonable and ordinarily prudent person would

do under the circumstances.'"  Freytag v. Commissioner, 89 T.C. 849, 887 (1987)

(quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g on this

issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir.

1990), aff'd, 501 U.S. 868 (1991).

There is a substantial estate or gift tax valuation understatement where the

value of  property reported on an estate or gift tax return is 50% or less of its correct

value. Sec. 6662(g)(1).[68]  Where property is reported at a value less than 25% of its

correct value, there is a "gross valuation misstatement" and the penalty imposed

under section 6662 is increased from 20% to 40%.  Sec. 6662(h).[69]

---

[68]No penalty is imposed unless the portion of the underpayment attributable to
substantial estate or gift tax valuation understatements for the taxable period (or
with respect to the estate of the decedent) exceeds $5,000. See sec. 6662(g)(2).

[69]In the Pension Protection Act of 2006, Pub. L. No. 109-280, sec.
1219(a)(1)(A) and (2)(B), 120 Stat. at 1083, Congress made it easier to trigger the
substantial valuation and gross valuation misstatement penalties. For estate and gift
tax returns filed after August 17, 2006, the penalty for a substantial valuation

(continued...)

[*108]  There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate (1) reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment.  Sec. 6664(c)(1).[70] Regulations promulgated under section 6664(c) further provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance upon the advice of a tax professional may, but does not necessarily, establish reasonable cause and good faith for the purpose of avoiding a section 6662(a) penalty.  See United States v. Boyle, 469 U.S. 241, 251 (1985)

---

[69](...continued) misstatement is triggered if the valuation is 65% or less of the correct value amount, up from 50%.  The penalty for a gross valuation misstatement is triggered if the value is 40% or less of the correct value amount, up from 25%.

[70]There is a special rule in sec. 6664(c)(2) with respect to charitable contribution deduction property requiring a qualified appraisal and a good-faith investigation of the claimed value by the taxpayer.  While the purchase agreement apparently contemplated a charitable contribution deduction to be claimed by HM6 on its Form 1065, U.S. Return of Partnership Income, there were no charitable contribution claims with respect to this transaction relating to either the Form 706 or the Form 709 at issue here.  Further, neither party has contended that sec. 6664(c)(2) is applicable here.  See supra note 14.  In any event, respondent has the burden of proof in this case as he acknowledged.  Thus, respondent would also bear that burden of showing a charitable contribution was in fact claimed and the additional limitations on a reasonable cause defense because of sec. 7491(c), and he has not carried that burden here.

**[*109]** ("Reliance by a lay person on a lawyer is of course common; but that reliance cannot function as a substitute for compliance with an unambiguous statute."). Such reliance does not serve as an "absolute defense"; it is merely "a factor to be considered." Freytag v. Commissioner, 89 T.C. at 888.

The Court's caselaw sets forth the following three requirements in order for a taxpayer to use reliance on a tax professional to avoid liability for a section 6662(a) penalty: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

As a consequence of our conclusion as to High Meadows' value, the estate petitioner substantially understated High Meadows' value for estate and gift tax purposes. On brief, the estate argues that it is not liable for the penalties because Ms. Lukemberg and the estate relied on professional advisers in valuing High Meadows for estate and gift tax purposes (and in reporting those valuations on the estate and gift tax returns). Respondent's position is that the estate cannot establish a reasonable reliance defense because the Giovacchinis failed to provide

[*110] Messrs. Kuckenmeister and Johnson with the information that was needed to accurately report High Meadows' value.[71]

With respect to the first prong of the <u>Neonatology</u> test, we conclude that the estate has established that Messrs. Kuckenmeister and Johnson were competent professionals who had sufficient expertise to justify reliance. <u>See</u> <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. at 99; <u>see also</u> <u>Boyle</u>, 469 U.S. at 250-251.

With respect to the second prong of the <u>Neonatology</u> test, we are satisfied that the evidence of record reflects that Messrs. Kuckenmeister and Johnson were provided the information that they needed to accurately and appropriately advise the family as to High Meadows' value. Mr. Kuckenmeister testified that the Giovacchinis were always forthcoming, never misstated anything, and provided him with sufficient information to prepare the returns. Mr. Kuckenmeister was particularly well informed and knowledgeable about High Meadows as the result of his extensive earlier work for the family and his involvement in the June 27,

---

[71]Concerning the penalty relating to the gift tax, respondent asserts that the Giovacchinis failed to inform Mr. Kuckenmeister of a $7 million offer from Mr. Merrill for High Meadows that they had received in February 2001. We have previously concluded that this "offer" was without substance and immaterial. <u>See</u> <u>supra</u> note 8.

[*111] 2000, sale of a 50% interest in High Meadows to HM6. The estate has satisfied the second prong of the Neonatology test.

Turning to the third prong of the Neonatology test, we conclude that the estate has demonstrated good faith reliance on the advice of Messrs. Kuckenmeister and Johnson. The issue in this case involves the tax consequences that flow from the valuation of a unique property in a unique location that is very difficult to value. The Giovacchinis had no tax expertise and relied on their advisers for the preparation of the estate and gift tax returns.[72] Mr. Kuckenmeister prepared the estate and gift tax returns. He was never instructed by the Giovacchinis to take any particular tax positions. We note also that the valuation reached by USFS and respondent contain material error further indicating the complexity and extreme difficulty of the valuation issues confronting the estate and its advisers.

Respondent argues that the estate's reliance was unreasonable because Mr. Harrison's first appraisal put the Giovacchinis, including Ms. Lukumberry and the

---

[72]The Giovacchini's, including Ms. Lekumberry and the estate, relied on Mr. Kuckenmeister to file the estate and gift tax returns and on Mr. Johnson to value High Meadows. They were also advised by an attorney named Andrew Mackenzie. We will take judicial notice of the State Bar of Nevada's business records, which appear to reflect that Mr. Mackenzie was admitted to practice in 1966 and has no record of discipline.

[*112] estate, on notice that High Meadows was worth at least $26 million. The parties to the purchase agreement signed the first amendment on June 27, 2002, which indicated that, for purposes of the proposed ALC transaction, the minimum fair market value for 1789.33 acres of High Meadows would be $26 million. High figures were being thrown at the estate but there was no reason to believe that those figures reflected reality, especially in the light of Mr. Kuckenmeister's advice and Mr. Johnson's valuation report.[73] ALC, by its own admission, could

---

[73]Respondent, in the estate tax statutory notice of deficiency, dated August 1, 2005, Form 886A, Explanation of Items, page 2, states:

> It is determined there is included in the value of the gross estate a 50-percent interest in 2,356.33 acres known as High Meadows Property located in El Dorado County, California rather than 1,789.33 acres as shown at item 10, schedule G of the estate tax return. It is also determined the date-of-death fair market value of the decedent's interest in this land and the timber growing thereon is $16,059,000 rather than $2,800,000 and $453,117 as shown at items 10 and 11.

The explanation intimates that the estate tax return included only a value for the 1,789.33-acre portion of High Meadows which was sold to ALC and hence to USFS. Allegedly omitted from the taxable estate was any amount for the retained 566 acres making up the balance of High Meadows at the date of Shirley's death. Were that allegation correct, the Court would agree with respondent that the estate would not have demonstrated good faith as it was well aware of High Meadows' total size and that 566 acres of the property was not included in the 1,789.33 acres sold to ALC. The Court concludes, however, that Mr. Johnson's appraisal of High Meadows and the estate's 50% ownership thereof included the entire property within its $2,800,000 value which was reported as Schedule G, item 10, of the estate tax return. We note that the $2,800,000 value is ascribed to the entire

(continued...)

[*113] not fund a purchase of High Meadows at anywhere near the $26 million

amount, and any transaction was totally dependent on the identification of another

purchaser by ALC who was willing and able to make a purchase of High Meadows

at a yet to be negotiated price. All ALC held was an option which they themselves

could not afford to exercise. The Giovacchinis and Mr. Kuckenmeister were in the

Court's view justifiably skeptical that the transaction would ever close. Mr.

Kuckenmeister is not qualified to value real estate, and we question Mr.

Kuckenmeister's valuation for gift tax purposes using a CPI adjustment to Mr.

Johnson's 1997 report. Nevertheless, under the circumstances, the Giovacchinis

and the estate were not required to second guess his advice. See Boyle, 469 U.S.

at 251 ("To require the taxpayer to challenge the attorney, to seek a 'second

opinion,' or to try to monitor counsel on the provisions of the Code himself would

nullify the very purpose of seeking the advice of a presumed expert in the first

---

[73](...continued)
"subject property" excluding the separately valued timber. The "subject property"
is defined and identified in Mr. Johnson's appraisal report as 2,553 ± acres at pages
5, 11, 18, and 19. Those 2,553.96 ± acres at $3,000 to $3,200 per acre result in the
$8,000,000 value assigned to High Meadows (i.e., 2,553 ± x $3,000 = $7,661,880
and 2,553.96 ± x $3,200 = $8,000,000) as the value of the entire property, thus the
estate's 50% interest in the subject property ($8,000,000 x .50 = $4,000,000) as the
value of the estate's interest. From this amount, he deducted his determined 30%
fractional interest discount, resulting in a value of $2,800,000 for all of High
Meadows, including the 566-acre retained portion.

**[*114]** place."). The estate has, therefore, demonstrated reasonable cause and good faith for the underpayment. As a result, the estate is not liable for the determined accuracy-related penalties under section 6662.

The Court has considered all of the estate's and respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.